**LEMPCO PRODUCTS, Inc., v. TIMKEN-DETROIT AXLE CO.**

No. 8042.

Circuit Court of Appeals, Sixth Circuit.

March 12, 1940.

A. C. Denison and John F. Oberlin, both of Cleveland, Ohio (Fay, Oberlin & Fay, A. C. Denison, and John F. Oberlin, all of Cleveland, Ohio, on the brief), for appellant.

F. O. Richey, of Cleveland, Ohio (F. O. Richey, of Cleveland, Ohio, William A. Strauch, of Washington, D. C., Richey & Watts, of Cleveland, Ohio, and Strauch & Hoffman, of Washington, D. C., on the brief), for appellee.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The patent involved in the present infringement suit, the validity of which is assailed, relates specifically to the driving shaft of an axle assemblage for automotive vehicles, being No. 2,022,581 issued to Herbert W. Alden and L. Ray Buckendale, November 26, 1935, upon an application filed February 16, 1934. It was held valid and infringed below.

The plaintiff and assignee of the patent is a large and well-known manufacturer of motor vehicle axles of which the patented shaft is a component part. The defendant manufactures axle shafts for replacement, a practice within limits permissive in respect to patented assemblies, Automotive Parts Co. v. Wisconsin Axle Co., 6 Cir., 81 F.2d 125; Timken-Detroit Axle Co. v. Automotive Parts Co., 6 Cir., 93 F.2d 76, save there be a valid patent upon the part replaced. Since replacement necessarily involves precise duplication of the original, there can be no question here of infringement and the issue is, therefore, solely one of validity.

The type of shaft covered by the patent is that provided with a splined connection in association with a female member which transmits driving torque to the wheel. In operation such shafts are subjected to severe torsional stresses, and with increase in size and load carrying capacity of busses and motor trucks, manufacturers of axle assemblages learned of many failures in axle shafts of conventional construction due to exertion of greater torque upon the shaft and increase of shearing stress upon the splines through sudden stops and jolts over rough road surfaces. An obvious response to such failures would have been to strengthen the shaft by increasing its diameter, but inescapable limitations interpose to a solution so simple. The over-all diameter of the male splined portion of the shaft is adapted to intermesh with complementary splines of a female member of the assembly, and the demands of the industry for the lowest specific gravity of vehicle body consistent with sufficient clearance to

safely avoid road obstructions, required that the splined member be restricted in size to intermesh with a female member of predetermined and standardized dimensions.

It was long recognized that the splined portion of a shaft is weaker and more susceptible to failure than its main body portion since the strength of the shaft is dependent primarily upon the root diameter of the shaft splines. In previous constructions there were frequent failures at the splines, some of them occurring in the splines where confined within the complementary splines of the female member, and more in that part of the splined section not so confined.

The patentees undertook to design a shaft of larger diameter than standard shafts, by increasing the root diameter of the splined portion without increasing the over-all diameter of the splines. It will readily be seen that this reduces the size of the splines. It also reduces the area of bearing surface upon which the complementary members exert a tangential driving force to apply torque to the shaft. By increasing the number of splines, however, and making them slant-sided instead of straight, the bearing surface of a shallow splined section may be increased to compensate for loss of bearing surface due to the reduced size of the splines. Another advantage claimed in the patent for a slant-sided spline, is that in the application to it of a tangential force the latter is resolved into a resultant force perpendicular to the surface, and so directed toward the base of the spline with a reduced tendency to shear it.

Admittedly, all of the elements of the patented combination including enlargement of the number of splines to 16, increase in the root diameter of the splines, milling them with slanting rather than vertical sides, were old in the art. The combination, however, is said to be new and to involve invention beyond the skill of the art. The new combination is said to have brought about a greatly improved result, adding approximately 30% to the strength of the shaft and an incalculable period to its life. It was a balanced shaft of substantially uniform diameter throughout, and its smooth and even contour avoided localized concentration of stresses and consequent possible breakage of the shaft.

■ It is elementary that a shaft strengthened by an increase of its diameter at its weakest point, and thereby capable of resisting greater torsional and shearing

stresses thrown upon it by utilization in larger and heavier vehicles, would be expected to satisfy immediate commercial needs, and if unaccompanied by neutralizing disadvantages success would inevitably follow. The favorable reception accorded to the patented shaft is here derived from tribute to an assemblage of which it was but a single component, but allocation of credit need give us little concern. As has frequently been said, commercial acceptance may not be relied upon first to create a doubt as to the exercise of invention and then to resolve the doubt. On the other hand, the challenge to the success of the new shaft is also of little importance in its bearing upon the present problem. The undertaking by the defendant to manufacture the new shaft for replacement would appear to have no purpose without recognition that a great number of axle assemblages incorporating it were in use by the public, and that notwithstanding increased strength some of them still would fail. The problem, as with many combinations of old elements, is to determine whether there has been anticipation, or whether, in the light of prior art, the advance is one involving the exercise of the inventive faculty. If in the light of engineering theory and practices at the time of the alleged invention, the expedients for increasing shaft diameter while restricted to predetermined overall dimensions for the splines were understood, then it was but routine response to the need for increased strength to design a shaft of greater diameter and so stronger.

■ The appellee recognizes, in paying tribute to the rule that a mere increase in the size of a device to secure a better result is not invention, the danger that resides in superficial consideration of a shaft of increased diameter leading to a conclusion that the improvement was obvious. So with urgent appeal for a more profound understanding of the invention, the achievement of the patentees is enshrouded with an aura of scientific learning comprehending resiliency of the metal, the importance of uniform distribution of stresses thereon and the limitations upon adherence of component crystals. This scientific wisdom doubtless has its uses, but as bearing upon the present problem we have found it as confusing as it is revealing.

It would seem to a layman familiar with but the simplest tools, that there is a resiliency in metal and resistance therein to force, that when force is applied beyond its

capacity either to yield or resist, the tool will break and, given uniformity of material, the failure will be at the place of least thickness or diameter. This the patentees recognized when they explained, as it had been explained before, that the strength of the shaft is dependent primarily on the root diameter of the splines. The current weakness they sought to remedy by the only expedient possible in view of the restrictions upon the outer diameter of the splined section,—a reduction in the size of the splines. So much would seem to be obvious even to the unskilled. Whether, in reducing the splines the tangential force could still be sufficiently exerted thereupon to impart predetermined torque, whether increase of bearing surfaces was inevitable and could be sufficiently provided by increasing the number of splines, whether shearing stress could be more successfully opposed by slant-sided than by straight splines, may have furnished room for invention if recorded art or standard engineering theory and practice provided no guides to solution.

Long before the alleged invention of the patent in suit, the Handbook of the Society of Automotive Engineers, 1926 Edition, gave specifications for splined sections with splines as many as 16, and teeth and serrations in uncounted number. Splines to the number of 24 were described in Dunwoodie, patent No. 1,779,805, having flat, angularly exposed sides, and Thiemer, No. 1,541,007, likewise disclosed slant-sided splines. There was no mystery in the concept that a shaft of substantially uniform diameter is stronger than one of varying diameter, for Younger, among others, in the Transactions of the American Society of Mechanical Engineers for 1916, pointed out that while the strength of a shaft should be calculated from the diameter at the bottom of the splines, "it would be advisable to turn down the shaft in the middle and so reap the advantage of having it uniformly strong throughout its length, and avoid trouble due to sudden changes in torque resisting values."

■■ We do not overlook the fact that the patent is for a combination and that there may be a new combination of old elements. Even so, there must be recognition of invention in the thought of combining them. Where such elements are already substantially combined in the same or even in an analogous art, there is little room for the exercise of the inventive faculty. Some of the elements of the alleged invention are already to be found combined in the shaft previously manufactured by the plaintiff, known as the SAE shaft, including the diametral relationship between the shaft body and the root of the splines. It is true that in our second decision in the piston cases, Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 108 F.2d 109, 113, 114, we observed that nothing is prior art in respect to function unless its function is understood by those skilled in the art. If this be pertinent it is not made applicable to the SAE shaft by representations that the plaintiff, in fabricating it, was not at all concerned with diametral relationship, since Younger had pointed to its importance and knowledge of its function was within the learning of the art.

■ Still more completely do the old elements appear to be combined in the shaft of the Autocar built in substantial quantities and sold from 1917 to 1921. An analytical comparison of that prior use device with the claims in suit, discloses great similarity if not complete or substantial identity. Claim 4 of the patent, printed in the margin,[1] is considered to be typical. The

---

[1] 4. A shaft designed to transmit a predetermined or given maximum torque through an internally splined female member of restricted size, said shaft having a splined section of over-all diameter that is limited by said restricted female member, said splined section comprising a portion adapted to be normally confined by the complemental splines of said female member and a runout portion which is unconfined by the latter, said shaft splines being of flat and slantsided formation whereby the tangential driving force which is directed against the respective splines confined by the complemental splines of the female member, during operation of the shaft is resolved into a resultant that is approximately perpendicular to the flat slanting sides of said splines so as to lessen possibility of failure thereof; said shaft having an elongated body section formed integral with and smoothly joined to said splined section; said elongated body section being of a diameter approximately equal to the root diameter of said splined section to provide torsional flexibility thereby preventing failure in the unconfined spline portion of said shaft splined section which would otherwise result from the limitation in size as required by said female member while simultaneously retaining sufficient capacity in said elongated body section to handle said maximum torque.

court below found the Autocar axle to have a root diameter at the splines substantially equivalent to the diameter of the body of the shaft, and perceived the only difference between the two to be a reduction in the size of the splines, while conceding the difficulty of comprehending any great improvement in the patent over prior art and acknowledging deference to the evidential presumption of validity residing in the patent grant. The Autocar prior use was not, however, before the examiner in the patent office, and no presumption of validity may overcome a pertinent prior art reference not there considered. Deller's Walker on Patents, 2010; Goodbody v. Firestone Steel Products Co., 6 Cir., 23 F.2d 625, 626; R. Hoe & Co. v. Goss Printing Press Co., 2 Cir., 30 F.2d 271, page 274.

It is not necessary to decision that we recognize the Autocar prior use as complete anticipation of the claims in suit. Perhaps it was not. It nevertheless so limits the forward step of the patentees that it is difficult, if not impossible, to recognize their achievement as more than designing a larger and, therefore, a stronger axle than had been made before by resort to expedients well understood in the art, and utilized when the need became apparent, and practical manufacturing considerations made the change feasible. We have already observed, Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948, that in mass production industries innovations requiring expensive machinery and retooling of plant do not always follow immediately upon recognition of their need.

Much has been made in brief and argument of the so-called "run-out" of the splines into the unconfined portion of the spline end of the shaft as contributing to the strengthening of the shaft at that end. There is a dispute as to what the evidence shows as to the Autocar shaft in this respect, although there would seem to be no patentable distinction between a spline which runs down from its outer diameter to the body diameter, and a groove which runs up from root diameter to body diameter. In any event, there is persuasiveness in the evidence that this is but a recognized mechanical expedient for bringing the tool out of the groove and avoiding sharp changes in shaft diameter which had long been recognized as contributing to breakage at that point. Our conclusion, upon a consideration of all aspects of the case, and with caution against being misled by apparent simplicity of the invention, is that the patentees produced a stronger shaft by expedients within the knowledge and skill of the art not rising to the quality of invention, and

The decree is set aside and the cause remanded with instructions to dismiss the bill.