# DETACHABLE BIT CO. v. TIMKEN ROLL-
## ER BEARING CO.
### No. 9219.

Circuit Court of Appeals, Sixth Circuit.

Feb. 2, 1943.

W. B. Morton, of New York City (John B. Hull, of Cleveland, Ohio, and H. Stanley Mansfield, of New York City, on the brief), for appellant.

Luther Day, of Cleveland, Ohio, and John G. Ketterer, of Canton, Ohio (H. C. Pontius, of Canton, Ohio, Leslie Nichols, of Cleveland, Ohio, James A. Carr and Joseph J. Gravely, both of St. Louis, Mo., Jones, Day, Cockley & Reavis, of Cleveland, Ohio, Lynch, Day, Pontius & Lynch, of Canton, Ohio, and Carr, Carr & Gravely, of St. Louis, Mo., on the brief), for appellee.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

The bill of the appellant setting up two causes of action, the first for breach by the appellee of obligations arising out of fiduciary relations, and the second for infringement by it of Thurston reissue patents No. 16,061 and No. 17,557, each for a drill, was dismissed below. The District Court concluded that the dealings of the parties did not create a joint venture giving rise to equitable or fiduciary responsibilities, and that in consequence there was no breach of legal duty by the appellee in the acts complained of. It found the first reissue patent invalid for failure of sufficient disclosure, and the claims of the second invalid by reason of anticipation. The appellant assails the entire result reached below.

The Detachable Bit Company is successor to the Detachable Bit Corporation, acquiring all its rights and liabilities of the latter prior to its dissolution in 1936. The predecessor had, since 1929, been a manufacturer of detachable bit rock drills embodying the invention of the Thurston patents. The subject matter of such patents is a detachable bit for percussion rock drills. A detachable bit is a removable cutter attached to the end of a drill rod, and the concept of such removable cutter was quite old. The appellant claims, however, that notwithstanding its antiquity, drilling of rock at the time of the applications, was universally carried out with a conventional hollow drill steel, the bit or cutting end of which was formed by forging a cutting edge upon the end of the drill rod itself and then tempering it to desired hardness. The failure of others to devise a successful detachable bit was due to the fact that the shocks and stresses to which a pneumatic percussion hammer drill is subjected, is so great that breakage offsets the advantages resulting from removable bits. Breakage was likewise true of the conventional piston drill, which was a single unitary piece of hollow rolled steel of full cross-sectional area from end to end. Prior to the efforts of Thurston, it is said, numerous attempts were made by inventors to produce a practical detachable bit, but the mining and quarrying industry became skeptical of its ultimate success by reason of repeated failures.

While Thurston disclosed both 3-piece and 2-piece assemblies, the 3-part assembly was selected by the Detachable Corporation for commercial exploitation. It was considered the more advantageous because the operator could not only supply himself with a number of bits, but also with spare couplings, either of which could readily be substituted on the drill rod in case of failure of original parts. The Detachable Bit Corporation organized in 1926 for the purpose of exploiting the inventions, at first operated under license, but later purchased the patents. Its earlier efforts were directed toward the development of manufacturing methods for quantity production of bits and couplings, and in 1928 it commenced distribution in a limited area out of New York City. Its capital was small but it hoped, when its product was demonstrated by commercial operation, to secure additional capital for extending the business throughout the country.

The Timken Company, in addition to other activities, was a producer of specialized steels. In 1929 negotiations were opened between it and the Bit Corporation, looking to some sort of an arrangement between them. The purpose of the Timken Company was to obtain an outlet for its steel; that of the Bit Corporation to secure the assistance of the highly skilled metallurgists and engineers of the Timken Company in developing its factory processes and their advice in the selection and treat-

ment of material out of which the bits were to be fabricated. The engineer sent by the Timken Company to investigate the business of the Bit Corporation, made a favorable report.

Whether the negotiations were initiated by Timken or by the Bit Corporation, we regard as wholly immaterial. The result was an agreement on July 9, 1929, by the terms of which Detachable undertook to purchase all of its steel requirements from Timken, Timken to loan it $100,000 by the purchase of its convertible notes in that amount, and to receive an option permitting it to convert the notes into an equivalent amount of stock at any time within nine months after their issue. Timken was also to receive an option, good until June 30, 1930, to execute a further contract pursuant to the form attached to the principal contract. Neither option was ever taken up by the Timken Company. In response to the agreement, Timken, during the summer of 1929, made recommendations as to the form of coupling, the design of bit, and the annealing methods of Detachable, and made numerous analyses of its steel, Much of the experimentation, looking to improvements in the bit and the development of manufacturing processes, were cooperative efforts by employees of both corporations. There was also some exploration of the national market for detachable bits. In February, 1930, Timken notified Detachable that it would not exercise the option reserved in the agreement and demanded payment of its notes. On February 11, 1930, the parties entered into an agreement providing that all contracts and agreements between the parties, including those dated July 9, 1929, were canceled and terminated, and each party released from all further obligations thereunder. The reasons for terminating the agreement are in controversy. Detachable argues that Timken desired to take advantage of its financial necessities to force it into a receivership and so to acquire its properties including the patents. There is no proof of this. Timken suggests improper representations by Detachable, that it had agreed to purchase Detachable securities and share in its management. Of this, as ground for cancellation, there is likewise no proof. We regard this issue, too, as immaterial, for whatever may have been the reason for the termination of the contract, it was ended by the voluntary agreement of the parties on February 11, 1930.

Detachable repaid its loan and released Timken from all further obligations.

In 1932 Timken commenced the manufacture and sale of detachable bit rock drills in competition with Detachable. It had, after the termination of its agreement in 1930, carried on experimental and development work on its own account which resulted in the granting of patent No. 1,876,565 in 1932, to its employee Buchwalter, and in later patents to Baker, No. 1,953,095 in 1934, No. 2,052,011 in 1936, and No. 2,052,019 in 1936, all of which Timken acquired and now owns. It was not until 1936 that the appellant acquired the business and assets of the Detachable Bit Corporation. It does not appear that that corporation had ever complained of any breach of fiduciary relationship by Timken, although in 1933 it had notified Timken that it was claiming infringement of its patents. On January 28, 1937, the appellant secured the assignment to it of the Thurston reissue patents, and in August, 1938, began the present suit.

Following the termination of the agreement between Timken and the Detachable Corporation, Timken continued to supply steel to it for the remainder of the year 1930, and to furnish it with technical information concerning steel analysis. That the results of the combined efforts of the two corporations failed to transform the Bit Company into a successful enterprise, is implicit from its subsequent history. It continued to lose money. In the spring of 1931 Detachable ceased manufacturing bits and their manufacture was taken over by the Flannery Corporation of Bridgeville, Pennsylvania, under license. There is evidence that Flannery, which had been given full information as to Detachable's methods of manufacture, found it necessary to develop processes of its own. The coupling was never satisfactory and Flannery received thousands of returned bit assemblies and later undertook to design a new type of bit wherein the coupling member was omitted. This evidence becomes important in view of the contention of the appellant that Timken acquired information as to valuable secret processes which formed the basis for its own subsequent development of detachable bits.

■ To demonstrate that Timken occupied to Detachable's predecessor a fiduciary relationship which imposed upon Timken an obligation not to compete with it in the manufacture and marketing of de-

tachable bits, the appellant urges that the relationship between the two corporations constituted a joint venture. It has been said that "A joint adventure, * * * exists when two or more persons combine in a joint business enterprise for their nutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management. It differs from a partnership in that it is ordinarily, although not necessarily, limited to a single transaction, whereas a partnership is ordinarily formed for the transaction of a general business." Chisholm v. Gilmer, 4 Cir., 81 F.2d 120, 124. A variety of elements have, from time to time, been considered as pointing to a joint venture, although perhaps not any one of them is conclusive. Among them are to be found agreements for sharing profits or losses as principals (Meehan v. Valentine, 145 U. S. 611, 625, 12 S.Ct. 972, 36 L.Ed. 835); the authority of each party to act for both in respect to the means or agencies employed to execute a common purpose (Kokesh v. Price, 136 Minn. 304, 161 N.W. 715, 23 A.L.R. 643); the incurring of joint obligations for the acquisition of joint rights (Gleichman v. Famous Players-Lasky Corp., 241 Mich. 266, 217 N.W. 43). Perhaps the most important criterion of a joint venture is the joint control or management of the property used· in accomplishing its aims.· Chisholm v. Gilmer, supra.

■ Analysis of the relations between Timken and Detachable fails to disclose any of the elements, upon which reliance commonly is placed, either arising out of the terms of the contract between the parties or out of its performance. No sharing of profits or losses ·was made or in contemplation; no joint property was involved; Timken had no authority over the management of Detachable and Detachable had no authority in the affairs of Timken. Even though we consider the objective of their cooperative efforts as limited to development of manufacturing processes and to steel analyses there is still no joint undertaking. It is true that if their efforts had been crowned with success each corporation expected to profit —Timken in the sale of its steel, and Detachable in the sale of its bits. But such profits would be individual to each of the corporations involved and not joint. In its experimentation Timken paid its own expenses and so did Detachable. There was no joint obligation. Neither corporation could nor did incur any indebtedness obligating both. We agree with the conclusion of the District Judge·that a joint venture did not arise out of the acts complained of.

■ Since the charge that there was breach by Timken of the obligations of a fiduciary relationship rests upon the premise that·the parties were engaged in a joint venture, failure to perceive this asserted relationship of the parties would seem to eliminate from the case all right of recovery based upon a breach of fiduciary obligation. There is, however, the added contention on the part of the appellant that in its experimentation Timken acquired valuable trade or manufacturing secrets which it subsequently used in breach of confidence in its own manufacturing processes. There is assertion but no proof of secret processes. Neither in brief nor oral argument was counsel able to indicate, even in a most general way, the trade secrets or processes that were obtained or appropriated. The subsequent experience of the Flannery Company appears to indicate that there were none. The District Judge was of the view that if Timken acquired any knowledge through its association with Detachable, such knowledge related to mistakes to be avoided rather than to valuable practices revealed or disclosed in confidence. Perhaps such knowledge has its advantages but it is doubtful that it forms a legal or equitable basis for recovery.

■ The court held reissue patent No. 16,061 invalid because of want of sufficient disclosure. The soundness of this view requires little demonstration. What Thurston claimed to have discovered was that by analyzing the stresses to which different parts of the conventional rock drill were subjected, it would be possible to make parts so selected and treated that they would accommodate themselves to such differing stresses. So in his preferred form which calls for three members in the drill assembly, the bit, the drill rod, and the intermediate or coupling member, he taught that the bit should be particularly designed to have "wear-resisting properties," the drill rod to have "fatigue-resisting properties," and the coupling member to have "shock-absorbing properties," these properties to be dominant in the several parts

of the drill. These descriptive generalizations are carried as elements into the claims, the precise language of which it appears unnecessary to recite.

 Nowhere in the description or specification of the patent is there any teaching as to how the wear-resisting, antifatigue and shock-absorbing properties are to be achieved, what alloys are to be used, or in what proportion, and the claims are not limited to steel but comprehend all materials now known or hereafter to be discovered. The claims are but an invitation to experiment. That this is true, the cooperative efforts of the parties, the previous explorations of the Detachable Corporation, and the subsequent activities of Flannery clearly demonstrate. As was said in Schriber-Schroth. Co. v. Cleveland Trust Co., 305 U.S. 47, 58, 573, 59 S.Ct. 8, 13, 83 L.Ed. 34, "The properties of any given material are many and diverse. The antithetical qualities of rigidity and flexibility of a structure are not absolute but relative; it may be more rigid than some and more flexible than others; too rigid for some purposes and too flexible for others. The one quality may be increased and the other diminished by choice of materials from which the structure is made and by variation in its proportions. If invention depends on emphasis of one quality over the other, * * * the statute requires that emphasis to be revealed to the members of the public, who are entitled to know what invention is claimed." Wear-resisting, anti-fatigue, and shock-absorbing properties are relative and not absolute terms, and even though addressed to those skilled in the art, it would be apparent, without the illuminating evidence of actual experimentation, that if there was invention by Thurston it was not disclosed as required by the command of the statute. 35 U.S.C.A. § 33; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Permutit Co. v. Graver Corp., 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163; Schriber-Schroth Co. v. Cleveland Trust Co., supra. Moreover, the claims are essentially functional. General Electric Co. v. Wabash Appliance Co., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402.

If anything more were needed to point to the inadequacy of the disclosure, the insistence of the appellant upon its possession and transfer to Timken of secret processes would furnish still another guide to decision. The claim that secret processes confidentially obtained led to Timken's successful manufacture of detachable bits, is impliedly but a concession of inadequate patent disclosure. Even when established, the existence of secret processes contributing greatly to commercial success, is of no aid in giving validity to a patent which fails fully to disclose the solution of a problem asserted to have been solved. A. O. Smith Corp. v. Petroleum Iron Works, 6 Cir., 73 F.2d 531.

The claims of reissue patent No. 17,557 are directed mainly to the form of thread uniting the three parts of the detachable bit construction of the type disclosed by the earlier Thurston patent. The claims in suit are 8, 9, and 10, printed in the margin,[1] and it will be observed that each of the claims includes as its essential element "screw threads of smooth, continuously curved and undulatory form." Thurston was seeking to avoid not only breakage of the threads uniting the several parts of the construction, but to avoid their jamming at the threads by reason of the powerful impacts given to the parts in use. The smooth, continuously curved thread had long been familiar in ordinary household appliances such as electric lamp sockets, stove pipes, glass jars, etc. It lends itself easily to being detached, and while it has all the strength possessed by screws with United States standard threads (known as Franklin Institute threads), is possessed of the additional advantage that it has no sharp edges or corners from which fractures may start. This was long understood. A thread of this type, known as the Whitworth form of thread, was discussed in Machinery Encyclopedia, Vol. 6, 268, 269, 270, published by the Industrial Press in New York in 1917.

---

[1] "8. A sectional mining drill having a coupling and its sections and coupling formed with and united by screw threads of smooth, continuously curved and undulatory form.

"9. An elongated coupling sleeve for rotary impact mining drills of separable parts, formed on its interior with screw threads of smooth, continuously curved and undulatory contour, as described.

"10. A sectional rotary impact mining drill of two or more sections having a plurality of its sections formed with and united by screw threads of curved undulatory contour."

The court held reissue patent No. 17,557 anticipated in recorded prior art citing numerous patents and publications. The most pertinent of the earlier patents are Davenport No. 1,054,181, and Bell, South Africa, 136/13 dated March 13, 1913. The Bell patent was for a thread with detachable bit, although a two-piece rather than a three-piece device. Whether or not there was complete anticipation, as found by the District Court, it is clear that the second reissue discloses no invention over prior art. While it is true that patents have frequently been sustained where mechanical expedients were derived from non-analogous arts and so not obvious, this has not been true where what was borrowed was a common and generally known expedient in mechanical arts. American Mine Door Co. v. Newberry, 4 Cir., 3 F.2d 435, 436; Lempco Products, Inc., v. Timken-Detroit Axle Co., 6 Cir., 110 F.2d 307. We are content to hold reissue patent No. 17,557 invalid for want of invention.

There was no estoppel to deny the validity of the patents in suit and our decision in A. O. Smith Corp. v. Petroleum Iron Works, supra, furnishes no support for this contention. It is true that upon consideration of a petition to review (74 F.2d 934, 935), we held that upon general equitable principles the plaintiff, found entitled to recover for the use of secret processes obtained by the defendant through breach of confidence, was entitled to an injunction to restrain infringement of patents subsequently granted for such processes. But as already indicated, there is here no proof of the existence, appropriation, or utilization of secret processes by Timken. It is true, of course, that Timken had assumed the validity of Detachable's patents and the legality of its title to them. There had, however, been no commitment on that score, by license or otherwise. Subsequent experience completely demonstrated the inadequacy of the disclosures and the release of Timken by Detachable from all obligations under the contract of 1929, being full and complete, left Timken free to pursue experimentation and exploitation on its own account limited only by the monopoly of patents if valid. In the light of our conclusions as to the invalidity of the patents, and the failure of Detachable to otherwise establish any legal or equitable obligation on the part of Timken, it follows that there is no need to discuss other issues raised by pleadings, claims of error, or urged in brief and argument.

The decree is affirmed.