## FRIES v. UNITED STATES.

No. 10700.

United States Court of Appeals
Sixth Circuit.

Nov. 22, 1948.

Charles B. Zirkle, of Louisville, Ky. (S. J. Stallings, F. J. McCormack and Charles B. Zirkle, all of Louisville, Ky., on the brief) for appellant.

Randolph A. Brown, of Louisville, Ky. (David C. Walls and Randolph A. Brown, both of Louisville, Ky., on the brief), for appellee.

Before HICKS, Chief Judge, and MARTIN and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

This civil action for damages for personal injury brought against the United States under the Federal Tort Claims Act [1] presents novelty. Admittedly, the plaintiff, Fries, now appellant, was injured in a street collision at Louisville, Kentucky, as the direct and proximate result of the negligent operation of a Plymouth automobile owned by the Public Health Service of the United States and furnished to the Louisville and Jefferson County Board of Health, for use in connection with a project hereinafter discussed.

The United States District Court denied recovery for the stated reasons that Croslin, who at the time of the accident was driving the Plymouth car, was not operating it for the United States; he was not under the direction and control of any agency of the federal government, but was occupying the status of a servant lent by the United States to the City and County Board of Health; and so, in relation to the legal consequences of his negligent acts, he was to be considered as the servant of the city and county and not as the agent of the United States.

The idea of conducting a local venereal case finding project originated with Dr. Lamb, Director of Communicable Disease Control of the Louisville and Jefferson County Board of Health. The basic objectives of the project, which were approved by the city and county officials and by the Jefferson County Medical Society, were "to find and bring under treatment as many cases of early syphilis and gonorrhea as possible within a forty-five day period" through the media of publicity and personal examinations, so as to induce persons who had been exposed to, or who suspected they might have, venereal disease, to report to the health department or to private physicians for examination and, if necessary, for treatment. Statistics were to be preserved for analysis.

Dr. Lamb's projected program differed in certain particulars from programs of a similar nature carried out in other states. He conferred with Dr. Blackerby, Health Commissioner of the State of Kentucky, in an effort to obtain state participation; and

asked that the health commissioner request the Surgeon General of the United States Public Health Service to send representatives to Louisville for a conference. His purpose was to obtain both state and federal aid for the project. In his project application, Dr. Lamb stressed the proximity to Louisville of some 30,000 Army personnel stationed at Fort Knox; and asserted that the Army had urged him to take necessary steps to institute such control measures as would assist in lowering the venereal disease rate at that Army base.

The state health commissioner approved a conference and, at his solicitation, the surgeon general sent to Louisville representatives of his department, including Warren T. Davis. This employee of the United States Public Health Service explained the procedure to be followed in order to obtain federal aid for the proposed project. Davis, who was experienced in this type of administrative work, assisted Dr. Lamb in the mechanics of obtaining the desired federal grant.

A blank form for projects, including appended schedules, was filled out on September 21, 1946; and, on the same date, the state health commissioner wrote a letter to the surgeon general approving and transmitting for his consideration the "project application for a scientific study to be known as the Louisville-Jefferson County Venereal Disease Case Finding Project." By letter of October 2, 1946, addressed to the Health Commissioner of Kentucky, the Assistant Chief of the Venereal Disease Division of the United States Public Health Service stated that the project as submitted had been approved by the acting surgeon general; and that, agreeably therewith, stipulated federal funds would be allotted under authority of the regulations governing grants to states pursuant to section 314 of the Public Health Service Act, 42 U.S. C.A. § 246. It was asserted in this letter that "the project would be conducted in cooperation with" the Venereal Disease Division of the United States Public Health Service.

In the application to the United States Public Health Service, Dr. Lamb was named director of the project; and it was

---

[1] 28 U.S.C.A. §§ 1291, 1346, 1402, 1504, 2110, 2401, 2402, 2411, 2412, 2671–2680.

provided that the Louisville and Jefferson County Board of Health would contribute $26,560 to the project, and that the Kentucky Board of Health would supply $10,000 as a publicity grant. The application proposed that the United States Public Health Service contribute $35,705, in addition to furnishing to the project five passenger vehicles and a complete laboratory equipped to handle 1500 tests per day. Attached schedules were made part of the application. It was stipulated in the first schedule that $14,780 of the $35,705 money contribution of the United States Public Health Service was to be used in payment of the salaries of specified personnel to be assigned to the project, including the salary of an administrative officer, and for penicillin and other materials and supplies. Davis was subsequently assigned to the project as administrative officer.

The second schedule provided that, from the $35,705 source of funds supplied by the Venereal Disease Division of the United States Public Health Service, $20,925 would be used for the payment of salaries of personnel employed locally. This listed personnel included six chauffeurs. Croslin, whose negligence in driving the automobile furnished by the government caused appellant's injury, was one of the chauffeurs employed pursuant to the provisions of this schedule.

The third schedule covered the estimated costs to be borne by the Louisville and Jefferson County Board of Health. The total sum of $26,560 to be contributed was broken down into $10,000 for publicity, $1,000 for material and supplies, and $15,560 for salaries of personnel to be assigned. The salary of the project director, Dr. Lamb, at the rate of $500 per month, was embraced in the specifications of this schedule, as was that of his assistant director whose salary was fixed at $400 per month. The list embraced a chief nurse, 7 supervising nurses, 23 staff nurses, 1 full-time physician, a purchasing agent, 6 lay investigators, 6 clerks, and 3 secretaries.

The project application, submitted by Dr. Lamb and approved by the state health commissioner and the surgeon general, made no mention of the maintenance or joint control of the project by the United States Public Health Service. The only person authorized to give Dr. Lamb orders as to the performance of his duties was Dr. Phair, his immediate superior in the Louisville and Jefferson County Health Department.

Dr. Lamb had "supervision of the conduct of the clinics and the overall efforts that were being expended in the proper conduct of the project." At the joint conference between representatives of the three governmental agencies, the heads of various departments, such as personnel, laboratory and clinics, were agreed upon; and Davis was delegated to look after personnel matters and administrative duties pertaining to routine administration delegated to him by Dr. Lamb. Davis admitted that Dr. Lamb had authority to request and obtain his recall from the project; and stated that his efficiency rating, while on the Louisville job, was to be made by Dr. Lamb.

Neither Davis nor any other representative of the United States Public Health Service possessed authority to alter any policies established by Dr. Lamb as project director. Davis, when asked what control, if any, the United States Public Health Service had over the money, personnel and equipment after its transference to the project, replied, "None." He declared that, during the period of his assignment in Louisville, he was not under the control of the United States Public Health Service but was responsible only to Dr. Lamb. He performed administrative duties prescribed by Dr. Lamb, including keeping time records, preparing payrolls, securing supplies, and hiring temporary locally employed personnel. For a time, he countersigned checks drawn on the project funds for the reason, as stated by him, that Dr. Lamb thought he ought to assume some responsibility in seeing that the checks were properly issued, inasmuch as he had charge of the timekeeping and the payrolls. After Davis left the project, however, the finance officer of the Louisville and Jefferson County Board of Health countersigned project checks with Dr. Lamb.

The money contributed by the United States Public Heath Service was furnished to the Kentucky Board of Health, which

allocated it to the city and county board of health, with the result that the money was then deposited to the checking account of the project, in charge of Dr. Lamb. The state health commissioner testified that the state board of health had no control over the project, and held the city and county health department responsible after the funds were transmitted to it.

Some of the scientific and special personnel listed in Schedule One, lent by the United States Public Health Service to the Louisville and Jefferson County Health Department, would not be available ordinarily in local communities for lack of special training; but the personnel listed in Schedule Two, including *chauffeurs*, could be employed locally. Accordingly, Administrative Officer Davis hired Croslin, who at the time was drawing unemployment compensation of $20 a week. At the time of the accident, Croslin was driving a Plymouth sedan, on the doors of which were painted the words: "U. S. Public Health Service." He was carrying to a doctor penicillin, packaged by Miss O'Brien, a nurse lent to the project by the United States Public Health Service as provided for in Schedule One. Croslin testified that he reported to Miss O'Brien each day, when he came to work in the morning and when he checked out at the end of the day.

The foregoing narrative would seem to constitute an adequate statement of the pertinent facts of records. The salient circumstance appears to be that the project was conducted by, and under the control and management of, the Louisville and Jefferson County Board of Health, with the aid and cooperation of, but without direction from, the Kentucky Board of Health and the United States Public Health Service. In final analysis, it was a local project, to which aid was contributed by both state and federal governments.

Appellant contends: (1) that the Louisville and Jefferson County Venereal Disease Case Finding Project was a joint venture conducted by the respective health organizations of the United States, the State of Kentucky, and the City of Louisville and County of Jefferson; (2) that

at the time of the accident Croslin, the negligent driver of the Plymouth automobile, was an employee and agent of the United States and under its direction and control; and (3) that neither Croslin, the automobile driver, nor Davis, the administrative officer, nor the Plymouth automobile, was lent to the Louisville and Jefferson County Board of Health so as to come within the "Lent Servant Doctrine," as applied by the United States District Court.

(1) Joint adventurers are, of course, responsible for the liabilities incurred within the scope of the enterprise. But the dealings, inter sese, of the respective governmental agencies in the instant case did not, in our view, constitute them joint adventurers possessing the essential characteristics to impose upon each the liabilities and legal consequences of a true joint venture.

Generally, a joint venture is created by the joining of two or several persons in a profit sharing business enterprise, with mutual understanding that each person shall participate in its management and control. To impute liability, however, the profit sharing motive may be absent. For example, a joint venture may exist in the operation of an automobile, even for pleasure. The most important criterion of a joint venture is joint control or management of the property used in accomplishing its aims. Detachable Bit Co. v. Timken Roller Bearing Co., 6 Cir., 133 F.2d 632, 635; Chisholm v. Gilmer, 4 Cir., 81 F.2d 120, 124.

To impute liability to a joint adventurer in the negligent operation of an automobile, it is necessary to show that such person had a voice and right to be heard in the management and control of the enterprise. See cases collated in American Jurisprudence, at pages 786, 787, 788.

Jones v. Nickell, 297 Ky. 81, 179 S.W. 2d 195, cited by appellant, lends no weight to his argument. There, the subject matter related to real estate dealings engaged in for profit. Incidentally, the Court of Appeals of Kentucky deemed it immaterial to determine whether the transaction constituted a partnership or a joint adventure.

Nor does Pearl Bowling & Co. v. Hensley & Hensley, 259 Ky. 651, 83 S.W.2d 31, furnish any guidance, for no issue of joint venture was involved in that case and it was held that a partnership did not exist.

In the only other case cited by appellant on the question of joint venture [except Detachable Bit Co. v. Timken, supra], Carboneau v. Peterson, 1 Wash.2d 347, 95 P. 2d 1043, 1055, it was held on the facts that there was no joint venture. The Washington court said: "The relationship must possess the element of equal right to a voice in the manner of performance of the enterprise. By this is meant that each of the parties has an equal right in the management and conduct of the undertaking, and that each may equally govern upon the subject of how, when, and where the agreement shall be performed. If the will or pleasure of one party is to control the others in these respects, there is no joint adventure." 1 Wash.2d 376, 95 P.2d 1055.

In Troietto v. G. H. Hammond Co., 6 Cir., 110 F.2d 135, 137, which was an action under Ohio Pure Food Laws to recover damages resulting from illness caused by eating infected meat, Judge Arant said: "A joint venture has been defined as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge. 23 O.Jur. 330. Each participant therein is agent for each of the others. [Citation.] And it is essential that each have control of the means employed to carry out the common purpose. [Citation.] "

 We have been cited to no authority holding the United States of America liable on a joint adventure. Certainly there was no express contract in the instant case by which the United States undertook to bind itself to the consequences of a joint venture with the State of Kentucky, the City of Louisville, and Jefferson County. The Surgeon General of the United States was authorized by section 241 of Title 42. United States Code Annotated, to "encourage, cooperate with, and render assistance to other appropriate public authorities" in relation to research, investigation, experiment and study concerning the cause, diagnosis, treatment, control and prevention of physical and mental diseases. There is no language in the Act which authorizes the United States Public Health Service to bind the United States as a joint adventurer. The United States can be bound only by the acts of an agent which are within the limitation of his authority; and this is true with respect, not only to express contracts, but to implied contracts as well. Farm Security Administration v. Herren, 8 Cir., 165 F.2d 554, 564. An express or implied contract binding the United States can be created only if some officer of the government, with express or implied power to commit the government to the contract, must have intended that result. Eastern Extension Tel. Co. v. United States, 251 U.S. 355, 363, 366, 40 S.Ct. 168, 64 L.Ed. 305.

For the reasons which we have attempted to make obvious, we are impelled to hold that there was no joint venture in the case before us.

 (2) The second two propositions of appellant, being intertwined, will be discussed together. It should be observed that the Federal Tort Claims Act provides that the United States District Court, sitting without a jury, is vested with exclusive jurisdiction to hear, determine and render judgment on any claim against the United States for money only accruing on and after January 1, 1945, "on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant for such damage, loss, injury, or death *in accordance with the law of the place where the act or omission occurred.*" [Italics supplied.] U.S.C.A., Title 28, § 931(a).[2] Inasmuch as the accident upon which the present action is grounded occurred in Louisville, Kentucky, the law of Kentucky is the controlling law of this case. The statute just cited provides further that the United States shall be liable in the same manner and to the same extent as a private

---

individual would be under like circumstances, except as to interest prior to judgment and as to punitive damages.

In rendering judgment dismissing the instant action, the district court followed and appropriately applied the law of Kentucky as promulgated in Stott v. Louisville & N. R. Co., 270 Ky. 787, 110 S.W.2d 1086.

In that controlling case, Stott was a mail truck driver in the employ of the United States at Louisville, Kentucky. His duty was to haul mail to and from the postoffice and various railroad depots in that city. He was injured while loading his mail truck from a platform in the yard of the Louisville & Nashville Railroad Company, when a porter employed by the railroad threw a heavy sack of mail in such negligent manner as to strike the plaintiff's foot.

In an action for damages, brought by Stott against the railroad company based on the negligent act of its porter, the highest Kentucky court declared that correct decision turned upon the status of the porter at the time of the accident. Plaintiff insisted that the porter was then serving his master, the railroad company, while the railroad urged that, under the "Lent Servant Doctrine," the porter at the time was serving the federal government, for the reason that under Postal Laws and Regulations, the porter, when he committed his tortious act, was subject to the orders and directions of the federal postal officers under whose charge he was performing the particular duty in which he was engaged.

The Postal Laws and Regulations [section 1745, subsection 2] required railroad companies to furnish the men necessary to handle the mails, to load them into and receive them from doors of railway postoffice cars and to pile the mails into and unload them from storage and baggage cars *under direction of the transfer clerk, or clerk in charge of the car, if one is on duty.* The regulations further provided that mails intended for delivery to postal clerks should never be placed in a postal car, unless there was a clerk on duty to receive and care for them. Another regulation [section 2096, subsection 2] provided that transfer clerks should supervise the handling and transferring of mails at railroad depots where they were stationed.

Despite the contention that no federal employee having authority of direction, or any sort of control, of the railroad porter was present at the time Stott was injured, the Court of Appeals of Kentucky held that under the "Lent Servant Doctrine" the railroad company was not liable for the negligent action of the porter, for the reason that at the time of the accident he was serving the lendee of his services, the United States Government. The state court expressed the conviction that it was its duty to follow the opinion of the Supreme Court of the United States in Denton v. Yazoo & Mississippi Valley R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310, which was considered to present "practically, if not completely, the identical question" under consideration, and to involve the same postal laws and regulations under substantially the same set of facts.

In the Denton case, supra, the Supreme Court affirmed the judgment of the highest court of Mississippi [160 Miss. 850, 133 So. 656] reversing a judgment against two railroad companies on the verdict of a jury in the trial court in favor of a United States railway postal clerk, who sustained an injury due to the negligence of a porter in the general service of the two railroad companies. At the time of the accident, the porter was engaged in loading mail into a mail car under the direction of a United States postal transfer clerk; and, in doing so, was not under the direction or control of either of the railroad companies. Mr. Justice Sutherland declared the rule to be elementary that "When one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former." [284 U.S. 308, 52 S.Ct. 142.]

The opinion of the Supreme Court pointed out that the statutory obligation imposed upon railroad carriers was simply to transport mail offered for transportation by the United States; that the carriers are not required to handle, load or receive mail

matter, but only to furnish the men necessary for those purposes; that these men handle the mails and load them into and receive them from the railway postoffice cars as prescribed by the regulations, "under the direction of the transfer clerk or clerk in charge of the car." The work performed by them was deemed to be that of the. government.

In support of his argument that the "Lent Servant Doctrine" is not applicable in the case at bar, appellant relies upon The Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480. However, the Supreme Court thus distinguished the Anderson case in the course of its opinion in the Denton case, supra: "In the Anderson Case, a winchman in the general service of the Standard Oil Company was furnished by the company to a master stevedore under contract with it to.load a ship with oil. The winchman, in operating the winch, depended upon signals to be given.by an employee of the stevedore to determine the proper time for hoisting and lowering the cargo. The negligence charged was that a draft of cases had been lowered before receiving the signal. This court held upon the facts, in the light of the rule which we have just stated and discussed, that the power, the winch, and the winchman were those of the company, and that the company did not furnish *them,* but furnished the *work they did* to the stevedore; and that this work was done by the company as its own work, by its own instrumentalities and servant under its control. A judgment for Anderson against the company was affirmed." [284 U.S. 310, 52 S.Ct. 142.]

In the concluding paragraph of its opinion in the Denton case, the distinction was pointed out further that, in the Anderson case, the work was that of the general master in the performance of which the servant had not passed under the direction and control of the person for whom the immediate work was being done, "the latter being looked to not for commands, but for information." The final observation was made that the facts of the Denton case "require a different conclusion."

█ Appellant makes the observation that Schedule One of the project application refers to "personnel to be assigned" and "equipment to be furnished," thus using the words "assigned" and "furnished" instead of the word "loaned." This argument is not persuasive. The postal regulation under which the "Lent Servant Doctrine" was applied in the Denton and Stott cases, supra, provides that railroad companies shall "furnish" the men .necessary to perform the requirements of the regulation. Moreover, the words "assigned" and "furnished," as used in the context, are reasonably to be read as synonymous with the word "loaned."

We find nothing in Webb v. Dixie-Ohio Express Co., Inc., 291 Ky. 692, 694, 165 S.W.2d 539, cited by appellant, to gainsay the conclusion which we have reached. That case merely holds that where it is shown that an automobile bore the name of the defendant and its chauffeur is shown to have been in its employ at the time of the accident, the presumption is raised that the employee was operating the automobile. in the scope of his employment. The point here is, as we have previously set forth, that the negligent chauffeur,. Croslin, was not in the employ of the United States, but was a servant lent to the Louisville and Jefferson County Board of Health at the time he caused the injury of appellant.

The judgment of the district court is. affirmed.