## CHISHOLM et al. v. GILMER.*
### No. 3970.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1936.

*Certiorari granted 56 S. Ct. 682, 80 L. Ed. ——.

Before PARKER and NORTHCOTT, Circuit Judges, and CHESNUT, District Judge.

PARKER, Circuit Judge.

This is an appeal in an action instituted to enforce the statutory liability of stockholders of a national bank against whom an assessment had been made as provided by statute. The action was instituted by the bank's receiver, by notice of motion for judgment under the Virginia practice, against one L. P. Chisholm and ten other persons, who were alleged to have subscribed, in the name of a trustee, to 230 shares of stock of the bank as joint adventurers and to have been the real owners of 220 of the shares, which were held in the name of the trustee, at the time of the bank's failure. The action was dismissed against five of the defendants because of their having received discharges in bankruptcy. It was continued as to one whose administrator interposed a defense of insanity. And it was tried against Chisholm and four others, who first pleaded in abatement that no writ had issued against them and that the action could not be prosecuted on notice of motion for judgment under the Virginia statute without service of process, and afterwards excepted to the order ruling them into trial, after the cause had been continued as to one of the defendants.

At the conclusion of the evidence, both sides moved for a directed verdict, and the trial judge directed verdict for plaintiff for the sum of $22,000 with interest from the date of the stock assessment. From judgment on this verdict, Chisholm and the other four defendants against whom judgment was rendered bring this appeal, contending (1) that the action could not be instituted by notice of motion without service of process by the marshal and that the plea in abatement should have been sustained; (2) that there was error in trying the case on the joint liability after it had been continued as to one of the defendants; and (3) that, on the facts, there was no joint liability on the part of the defendants for the stock assessment, and that it was therefore erroneous to deny their motion for directed verdict and to direct verdict against them.

The procedural questions can be briefly disposed of. It has been recent-

H. W. Walsh, of Charlottesville, Va., and M. J. Fulton, of Richmond, Va., for appellants.

Murray M. McGuire, of Richmond, Va., and George Gilmer, of Charlottesville, Va. (Gilmer & Graves, of Charlottesville, Va., and McGuire, Riely & Eggleston, of Richmond, Va., on the brief), for appellee.

ly decided by this court, after full consideration, that notice of motion for judgment under the Virginia practice is a proper method of procedure for enforcing the statutory liability of a stockholder of an insolvent national bank, and that, on such notice of motion, it is not necessary that writ or other process be served by the marshal to bring defendants into court. Eley v. Gamble (C.C.A.4th) 75 F.(2d) 171. And we think it equally clear that under the Virginia practice it was proper to proceed against appellants notwithstanding the continuance as to one of the defendants. It is true that the liability of defendants was joint; but the action was one for the recovery of money, and section 6047 of the Code of 1930 provides:

"§ 6047. *Against whom of those liable, judgment may be given on motion.* —A person entitled to obtain judgment for money on motion, may, as to any, or the personal representatives of any person liable for such money, move severally against each, or jointly against all, or jointly against any intermediate number; and when notice of his motion is not served on all of those to whom it is directed, judgment may nevertheless be given against so many of those liable as shall appear to have been served with the notice, but the judgment against such personal representative shall, in all cases, be several. Such motions may be made from time to time until there is judgment against every person liable, or his personal representative."

And it is well settled that the liability of the stockholder is contractual, being based upon his original stock subscription. Richmond v. Irons, 121 U.S. 27, 55, 7 S.Ct. 788. 30 L.Ed. 864; Matteson v. Dent, 176 U.S. 521, 525, 20 S.Ct. 419, 421, 44 L.Ed. 571. As said by Chief Justice White in the case last cited, "The obligation of a subscriber to stock to contribute to the amount of his subscription for the purpose of the payment of debts is contractual, and arises from the subscription to the stock." This being true, there can be no doubt of the right of plaintiff to proceed to judgment against a part of the defendants jointly liable for the subscription under section 6265 of the Code of 1930, without proceeding against the others. The pertinent portion of that statute is as follows:

"Upon all contracts hereafter made by more than one person, whether joint only or joint and several, an action or motion may be maintained and judgment rendered against all liable thereon, or any one or any intermediate number, and if, in an action on any contract heretofore or hereafter made, more than one person be sued and process be served on only a part of them, the plaintiff may dismiss or proceed to judgment as to any so served, and either discontinue as to the others, or from time to time as the process is served, proceed to judgment against them until judgment be obtained against all."

Coming to the merits of the case, we note that at the conclusion of the testimony both sides moved for a directed verdict. It is well settled that this amounts to a waiver of jury trial and a consent that the trial judge decide the issues and direct a verdict accordingly; and, in such case, upon exception to an adverse finding and direction, the only question is whether the verdict as directed is supported by substantial testimony. In other words, the verdict must stand unless the party against whom it has been directed was entitled to have it directed in his favor. Williams v. Vreeland, 250 U.S. 295, 39 S.Ct. 438, 63 L.Ed. 989, 3 A.L.R. 1038; Sena v. American Turquoise Co., 220 U.S. 497, 501, 31 S.Ct. 488, 55 L.Ed. 559; Beuttell v. Magone, 157 U.S. 154, 15 S.Ct. 566, 39 L.Ed. 654; Barringer v. Dinkler Hotels Co. (C.C.A.4th) 61 F.(2d) 82, 83; Swift & Co. v. Columbia Ry., Gas & Electric Co. (C.C.A.4th) 17 F.(2d) 46, 49, 51 A.L.R. 983; Lawton v. Carpenter (C.C.A.4th) 195 F. 362. The only question left for our determination, therefore, is whether, upon the evidence, defendants were entitled to a directed verdict. We agree with the judge below that they were not.

The eleven defendants against whom the suit was brought constituted the board of directors of the First National Bank of Louisa, Va. They owned 75 per cent. of the capital stock of that bank, which was only $50,000, and they owed the bank $47,371 on their own notes and were liable to it on loans to others to the extent of $48,971. It was thought that the deposits of the bank, amounting to six or seven hundred thousand dollars, were out of proportion to the capitalization and

that it would be advantageous to increase the capital stock by 50 per cent. and sell the new stock as widely as possible among the citizens of the county where the bank was located. Increase of capital stock was accordingly authorized and the price of the new shares was fixed at $150. Notice of the right to subscribe was given stockholders, but only a very few shares were sold in this way and none to the directors themselves.

In order to float the stock and distribute it in the county without depressing the price of $150 per share, the directors agreed to purchase the stock and hold it until it could be resold and to resell it if possible among the people of the county. The directors thereupon subscribed for 230 shares of the stock in the name of J. P. Donnally, one of their number, as trustee, and raised the money to meet their subscription by borrowing from another bank and executing their joint note for the amount. The stock was issued to and held by Donnally as trustee. He collected the dividends thereon and applied them toward paying the interest on the note, the additional amounts necessary for that purpose being put up by the directors. Ten shares of the stock thus purchased were sold, and the proceeds thereof were applied on the note.

Several of the defendants took the stand and testified that each was to own one-eleventh of the stock purchased; but it is clear that, while each had a one-eleventh interest in the enterprise, the stock was purchased as a result of the joint action of all, that it was paid for with the proceeds of a note that they executed jointly, that it was held in trust for their joint use and benefit, that they shared in the losses sustained as a result of the purchase, that the dividends received were applied for their joint benefit, that each had an equal voice in the management of the enterprise, and that they would have shared equally in profits, if profits had been realized.

It is true that defendants did not expect to realize any direct profit from the resale of the stock, but the purchase and resale were intended to benefit them in ways other than the realization of a direct profit. The increase in the capital stock of the bank was necessary in view of the size of the deposits; and no one would benefit from this increase as much as would directors who owned 75 per cent. of the stock and whose debts to the bank exceeded the capitalization. The purchase of the stock was clearly undertaken in an effort to strengthen the bank in which they were interested; and, that it was in fact a joint enterprise on the part of the directors, and not one which assumed the appearance of such an enterprise by accident, is shown by the fact that, while a number of the directors were financially unable to make purchases on their own account, the purchase went forward notwithstanding this fact. Only on the theory that the enterprise was engaged in by the board in a joint effort to strengthen the bank, can the fact be explained that the financially strong directors entered into the purchase with those who were unable to carry their part of the load. And this in effect is the testimony of the defendant Chisholm. He said in explanation of why the matter was handled as it was:

"When he (Chisholm) gave that note he had a pretty good account, perhaps $15,000.00 and could have written a check for two or three times his one-eleventh, but did not do it because he agreed to take one-eleventh, some of them were not able to pay cash and all agreed to sign the note in order to go along so Mr. Donally would have authority to sell it any time he got ready; they weren't able and we all agreed we would carry it along; Mr. Perkins said he was able, he offered to pay it same as witness and get his stock, and he agreed like witness to go along with the others on that note; some said they were not able to pay their part and decided it was best for the bank for all to carry it on together."

C. L. Perkins, one of the defendants, testified:

"He (Perkins) agreed to try to pay one-eleventh instead of going on the big note, didn't want to go on any of it; was ready, willing and able to pay his one-eleventh; didn't mind owning one-eleventh at that time, but they said that they wanted the stock in order to distribute it around among the people and he already owned twenty shares of it then, and 'they didn't want us to own any more,' they wanted to distribute it around amongst the others.

"Q. And they wouldn't agree for you to pay your one-eleventh and stay off the note, would they? A. No, sir. I

asked about the note and, as I thought, the understanding was when they got this stock and got straightened out some of them said they didn't have the money and I don't know that anybody else really said they wanted to pay or anything of the sort, but I never had signed a note for other people and I didn't want to go on that one but I did go on it after they told me that the capital in the bank was more than the capital stock of the bank and that was the way they claimed to be taking it out, was to take care of that."

It is clear, we think, that, with respect to the purchase, holding, and sale of the stock in question, the defendants were engaged in a joint enterprise. Of course, they were not partners generally, but they unquestionably assumed the relationship of partners with respect to this particular undertaking; and that is the essence of a joint adventure. Dexter & Carpenter v. Houston (C.C.A.4th) 20 F.(2d) 647; Joring v. Harriss (C.C.A.2d) 292 F. 974, 978; Reid v. Shaffer (C.C.A.6th) 249 F. 553; In re Kessler & Co. (D.C.) 174 F. 906; Van Tine v. Hilands (C.C.) 131 F. 124; Delmonico v. Roudebush (C.C.) 5 F. 165; Lyles v. Styles, 15 Fed.Cas. page 1143, No. 8,625; 33 C.J. 842; 15 R.C.L. 501; notes 48 A.L.R. 1062 and 63 A.L.R. 914. Although combination for the purpose of making profits is ordinarily characteristic of a joint adventure, the purpose of making direct profits is no more essential to that relationship than to that of partnership. A joint adventure, we think, exists when two or more persons combine in a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management. It differs from a partnership in that it is ordinarily, although not necessarily, limited to a single transaction, whereas a partnership is ordinarily formed for the transaction of a general business (33 C.J. 842), and in that the interest of the joint adventurer may be recovered at law, and accounting in equity need not be resorted to as in case of partnership. Joring v. Harriss, supra. The relationship was defined by Judge Hough of the Second Circuit, in the case last cited as "a commercial enterprise by several persons jointly."

As was held in Bowmaster v. Carroll (C.C.A.10th) 23 F.(2d) 825, upon which defendants rely, the purchase of property by two or more persons, each of whom contributes a portion of the purchase price, makes them joint owners of the property, but does not, without more, establish between them the relation of joint adventurers. 33 C.J. 842. But there is much more shown here than the mere purchase of the stock. That purchase was made, not as an end in itself, but as a means of strengthening the bank, an object in which all of the directors were interested. The purchase was a joint purchase, made with the proceeds of a joint loan for which a joint note was executed. The purchase was made in order that the stock might be resold to the advantage of the bank and its stockholders and it was placed under the control of a trustee in order that sales might be made by him. The dividends, which were profits derived from holding the stock, were applied on the joint obligation incurred in connection with its purchase; and the funds necessary to pay the interest on the joint note, and thus to continue to carry the stock, were raised by equal contributions from all the defendants. Each had an equal voice in the control and management of the enterprise; and there can be no doubt but that the intention was that all should share equally any profits and losses resulting therefrom. If secret profits had been made by one of the defendants in connection with the handling of the stock, he could unquestionably have been required by the others to account therefor. In other words, what we have is not a mere acquisition of property by two or more persons, but an enterprise entered upon by them to acquire, hold, and sell additional stock of a bank for the purpose of strengthening that institution in which they were interested, with the acquisition of the stock as one of the steps in that enterprise.

There can be no question as to the responsibility of the joint adventurers for liabilities incurred within the scope of the enterprise. 15 R.C.L. 505; 33 C.J. 871–873. And certainly it is too clear for discussion that a stock assessment on stock purchased in the carrying on of the enterprise is such a liability.

And we think that the same result follows if the relationship of the defendants as joint adventurers be ignored. Un-

questionably they made a joint subscription for the stock through their trustee; and, if the suit were on this joint subscription, there would be no question as to their joint liability for the entire subscription price. Williston on Contracts § 322; New Haven & Northampton Co. v. Hayden, 119 Mass. 361 (per Gray, J.); First Trust Co. v. Miller, 160 Wis. 336, 151 N.W. 813; Foot v. Great Northern R. Co., 81 Minn. 493, 84 N.W. 342, 52 L.R.A. 354, 83 Am.St.Rep. 395; 14 C.J. 538. As the subscription was a joint subscription and the stock was held in trust for the subscribers jointly, the liability for stock assessment was also joint, being "contractual," and arising from the "subscription to the stock." Matteson v. Dent, 176 U.S. 521, 525, 20 S.Ct. 419, 421, 44 L.Ed. 571; Richmond v. Irons, 121 U.S. 27, 55, 7 S.Ct. 788, 30 L.Ed. 864. If the trustee had subscribed for stock for each of the defendants individually, a different situation would be presented, even though one block of stock had been issued to him as trustee; but this is not what happened. He subscribed for the defendants jointly and held the shares of stock which were issued upon the subscription for their joint use and benefit, to be devoted to a joint purpose and not to be divided among them. Not only was there no subscription for the defendants individually, but none of them could have required the trustee to allot to him his interest in the stock in severalty.

A case very much in point is English v. Gamble (C.C.A.8th) 26 F.(2d) 28. In that case the stock of a national bank had been assessed and, upon failure of some of the stockholders to pay the assessment, the directors put up the deficiency. Afterwards the stock of the defaulting stockholders was sold and was purchased by a trustee for the directors who had made good the deficiency; and he thereafter held the stock for their benefit. Subsequently the bank failed and a stock assessment was levied against the directors jointly for the amount of the stock held in trust for them by the trustee. In holding the directors liable for the assessment, the Circuit Court of Appeals of the Eighth Circuit, 26 F.(2d) 28, 30, said: "Shorn of all technicalities, clearly this made the defendants the joint owners of this particular stock which was still held by them in the name of the trustee at the time the bank closed its doors.

As such joint owners they became jointly and severally liable for the subsequent assessment."

There was no error and the judgment appealed from will be affirmed.

Affirmed.