RAFAEL BUSCAGLIA, TREASURER OF PUERTO RICO, Petitioner, v. TAX COURT OF PUERTO RICO, Respondent; COMMUNITY OF THE HEIRS OF MATEO FAJARDO CARDONA, Intervener.

No. 203. Argued March 1, 1949.—Decided June 21, 1949.

94

*Vicente Géigel Polanco*, Attorney General, and *Edgar S. Belaval*, Special Counsel for the Department of Justice, for petitioner. *Oscar Souffront*, *Amador Ramírez Silva*, and *Andrés Guillemard*, for intervener, complainant in the main action.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

On August 30, 1944, the Treasurer of Puerto Rico notified the Community of the Heirs of Mateo Fajardo Cardona income tax deficiencies for the years 1938, 1939, 1940, and 1941 amounting to $57,245.31, pursuant to § 2(a)(3) of Act No. 74 of 1925 [1] and the same as amended by Act No. 31 of April 12, 1941. [2]

Feeling aggrieved by the Treasurer's notice, and after complying with the necessary legal requirements, the taxpayer filed a complaint in the Tax Court. After a hearing the court reached the conclusion that since Community of

---

[1] Section 2(a)(3) of the Income Tax Act, as it was in force until December 31, 1939, provided that:

"(3) The term 'partnership' includes civil mercantile partnerships and industrial, agricultural or professional partnerships, or partnerships of any kind, and all classes of associations.".

[2] As amended by Act No. 31 of April 12, 1941, with retroactive effect to January 1, 1940, § 2(a)(3) reads as follows:

"The term 'partnership' includes civil, business, industrial, agricultural and professional partnerships or of any other kind, whether or not its constitution is set forth by public deed or private document; and it shall include, further, two or more persons, under a common name or not, engaged in a joint venture for profit."

the Heirs of Mateo Fajardo Cardona was established under the Civil Code of Puerto Rico regulating it and was not a *sociedad* or a "joint venture", it was not bound to file income tax returns and consequently, set aside the deficiencies assessed by the Treasurer to said community.

Dissatisfied with that decision, the Treasurer filed the present writ of certiorari alleging that the lower court committed two errors: In permitting the taxpayer to file an amended complaint challenging certain actions of the Treasurer which had not been attacked in the original complaint and in holding that the taxpayer was not a *sociedad* or a joint venture for profit.

We shall discuss the second error assigned, since the petitioner admits that if we affirm the decision of the Tax Court, it will be unnecessary to pass on the first assignment.

In accordance with a stipulation of the parties the Tax Court stated that there is no conflict as to the following facts:

"Mateo Fajardo Cardona, on his death on February 6, 1934, left as his sole heirs: Antonia Cabassa Texidor widow of Fajardo, José Angel, Mateo, María Luisa, Carlos H., Emilia, Lydia, and Rosalinda Fajardo Dávila, and Teodoro Fajardo Cabassa.

"By deed No. 51, executed on November 13, 1935, before Notary Miguel A. García Méndez, said heirs made a compromise partition of the estate of the decedent Mateo Fajardo Cardona.

"On June 13, 1938, in accordance with the provisions of deed No. 102 executed by Central Eureka, Inc. in favor of Community of the Heirs of Mateo Fajardo Cardona before Notary Oscar Souffront, the properties described in said deed No. 102 were sold undividedly and in common ownership to the above-mentioned heirs and their spouses, and a community for the term of 10 years was created.

". . . . . . .

"The members of the above community prepared, on September 15, 1938, a document which they called 'Rules for the Administration of the Community of the Heirs of Mateo Fajardo y Cardona', and which contained the terms, agreements, and stipulations under which the interested co-owners bound them-

selves to direct and manage the community of which, at that time, they were a part. On the same date, they drew up another document supplementing said rules for the administration of the community.

"Both were protocolized under a deed executed before Notary Carlos García Méndez, in San Germán on September 28, 1938.

"According to the contents of said rules for the administration, the petitioners agreed, among other things:

"(1) To remain in the community for a period of 10 years without prejudice to extending it for whatever length of time might be necessary and in accordance with the law. See § 326, second paragraph, and § 334 of the Civil Code.

"(2) None of the co-owners shall, without the consent of the others, sell, assign, encumber, or alienate in any manner whatsoever to third persons or any entity their interest in the lands held in common, or in their rights or shares; but if any of the co-owners shall have the urgent need of encumbering his share in order to raise funds, he shall inform the other co-owners giving them the option to procure the necessary loan. In case that none of the co-owners should offer credit, and hence the share corresponding to the condominium be encumbered in favor of a third person, said encumbrance shall be made on condition that, in the event of a foreclosure, the creditor or his assignee shall bind himself to accept the community and all its terms and agreements for the term fixed, or as extended. See §§ 332, 333, and 334 of the Civil Code.

"(3) The community shall have power to raise funds for agricultural advances for whatever terms and conditions be necessary by consent of ⅘ interest of the co-owners. See § 326 (second paragraph) and § 332 of the Civil Code.

"(4) The weekly disbursements required for the cultivation and harvest of the real property owned in common shall be made through vouchers and checks to cover the amount thereof which shall be signed by the manager and the person appointed by the co-owners, of by one of the latter together with the manager or the person appointed for that purpose; and in case of estoppel, by two of the co-owners. See §§ 326 and 332 of the Civil Code.

" . . . . . . .

"All the property acquired by Community of the Heirs of Mateo Fajardo Cardona up to April 1, 1938, were purchased from Central Eureka, Inc. It is enumerated and described in the above-mentioned deed No. 102, *supra*.

"During the time mentioned in the complaint, Community of the Heirs of Mateo Fajardo Cardona was one of the *colonos* of the Central Eureka, Inc.

". . . . . . .

"In connection with the accounts for agricultural advances the litigants stipulated that Central Eureka, Inc., as a rule credited the amounts received from the grinding of cane during each crop season in favor of Community of the Heirs of Mateo Fajardo Cardona; and that the Community in turn debited in its books the same sums against the Central Eureka, Inc.

"The total proceeds of the cane, during the time in question, is greater than the amount charged for interest entered in the books of Central Eureka, Inc.

"No check was ever issued by the Central nor by the community to settle the accounts between them; and it was from the cash accounts, with their corresponding debits and credits, that they obtained the final results on which to base a liquidation, if necessary..

"All the petitioners who have appeared in the above-entitled case and who were members of the Community of the Heirs of Mateo Fajardo Cardona, received their shares in the profits obtained by the latter during the years they were co-owners; and they included in their individual returns their proportional shares in the distribution of the profits obtained by the community.

"When the conveyance of the land of the community was made on June 13, 1938, each co-owner signed nine mortgage notes for the sum of $30,428.41, the payment of which amounting to $273,855.69 was secured by a voluntary mortgage, described in deed No. 102, *supra*, on the 39 rural properties. The mortgage also covered a credit of $15,000 for default interest and another of $10,000 for costs and attorney's fees in case of judicial claim or litigation, none of the notes signed being *in solidum*, and the liability of each co-owner being limited to the share belonging to him in the entire undivided and common property.

". . . . . . .

"When the time came when it was convenient for the Central Eureka to separate its industrial activities from others it had in connection with the planting and cultivation of cane, it undertook, in the speediest possible way and under the advice of

counsel, to create a community which would acquire all the property of the central.

"When the conveyance was made, all the purchasers were shareholders of Central Eureka, Inc., and the interest which each one acquired in the property as a whole was approximately equal to their share in the capital of the central. See Exhibit I, *supra*.

"From the time of the conveyance, the properties have always been operated and managed in the same manner, that is, without any chances, although according to the testimony of co-owner Jaime Annexy, they have repeatedly taken steps and made every effort to carry out a partition. The obstacles, among other things, were due to the fact that the lands are physically of a varied character, some of them being suitable for pastures; others for coconuts, and others for sugar cane. Certain parcels have alluvial soils and others are highlands. Some are marshy; others barren, or hilly. Their value, therefore, varies greatly.

"The death of some of the co-owners complicated the situation and made the division still more difficult. In order to facilitate said division the properties were again surveyed and new drawings made in which the detail of each property appeared. With the use of the drawings it was easier to reach some agreements as to the future division; and it was agreed to make certain subdivisions in order to reduce the divisor of the total area of the property from 20 to 6 or 7.

"However, shortly thereafter the threat of the lands being condemned by the Land Authority arose and also the possibility that some of the parcels, worth $500 per acre, be condemned at the price of $100 per acre.

"In accordance with the agreement of the co-owners and pursuant to the rules for the administration of the community, the latter had to appoint a manager 'to attend to the cultivation, development and conservation of the lands' in question, besides all the duties and powers which generally devolve upon a field manager according to custom and usage in Puerto Rico.

"The weekly disbursements and the ordinary expenses connected with the cultivation of the farms were actually authorized and made by the aforesaid field manager; but he could not, neither could the co-owners, carry out banking transactions, nor purchase or sell, encumber or in any manner whatsoever alienate the properties without the previous consent of all the co-owners. None of them could act, or did act in the name of the others.

"After Act No. 31 of 1941 (Laws of 1941, p. 478), amending retroactively § 2(a) (3) of the Income Tax Act became effective, it was questionable whether a community like the one constituted in the above-entitled case would have to pay income taxes the same as a *sociedad*.

"In view of such doubt Community of the Heirs of Mateo Fajardo Cardona filed a return for the year ending on June 30, 1941. It did so because the public accountant who usually prepared its income tax return advised it to file an income tax return in the Department of Finance and to pay the corresponding tax without prejudice to subsequently claiming the refund of the money unduly paid. See Exhibit H of the respondent in which the word *sociedad* appears crossed out and the word community appears typewritten.

"The plaintiffs had previously filed their individual income tax returns in the Department of Finance, setting forth therein their respective income derived from the shares received from the Community of the Heirs of Mateo Fajardo Cardona.

". . . . . . .

"On January 7, 1944, Antonia Cabassa widow of Fajardo and Teodoro Fajardo Cabassa filed in the District Court of Mayagüez, a civil action for the division of the Community of the Heirs of Mateo Fajardo Cardona, in connection with the same undivided property acquired in common ownership, according to the terms of deed No. 102, *supra*.

"The property acquired by the appellants was devoted before as well as after the conveyance, during the years referred to in the complaint, to the cultivation of sugar cane."

In accordance with these proven facts the Tax Court held that Community of the Heirs of Mateo Fajardo Cardona was not, during the years 1938 and 1939, a *sociedad*, nor during the years 1940 and thereafter, a joint venture for profit.

The facts which the Tax Court considered as proved are amply upheld by the stipulation of the parties and by the additional evidence introduced. We must accept them— *Buscaglia, Treas.* v. *Tax Court*, 69 P.R.R. 792, and confine ourselves to deciding whether those facts support the conclusions of law reached by the court.

In *Carle* v. *Benítez*, 46 P.R.R. 182, 186, we have already set forth several of the characteristics which dis-

tinguish the community from the *sociedad*, citing commentaries of Manresa to this effect.

We have also held that " .... the term 'partnership' is not used in our Income Tax Act in the common law sense. It is a translation of the term 'sociedad' found in the civil law. And a *sociedad* is a juridical person apart from the members thereof." *Ballester* v. *Court of Tax Appeals*, 61 P.R.R. 460, 478. And see *Buscaglia, Treas.* v. *Tax Court*, 65 P.R.R. 9 and 339 and *Wild* v. *Commissioner of Internal Revenue*, 62 F. 2d 777, (C.C.A. 2d, 1933), certiorari denied in a similar case in 289 U. S. 754, wherein it was held that the word partnership under the Federal Income Tax Act of 1921 (42 Stat. 227), means an ordinary partnership and that a syndicate created by a contract to use the contribution of its members to buy, hold, and sell securities and land did not constitute a partnership under said Act, which in its § 2 defines the word "person" as including "partnerships", corporations, as well as individuals and in its § 218(a) provided "That individuals carrying on business in partnership shall be liable for income tax only in their individual capacity." In this last case it was said at page 778:·

". ... All we have to decide is whether it was either a partnership, stricti juris, or such a joint venture as interposed no fiduciary to insulate the owners from direct taxation. It is true that the local law does not control in such a case. Though the syndicate be not a partnership by New York law, it still may be one under the revenue law; the converse was held in *Burk-Waggoner Oil Ass'n* v. *Hopkins,* 269 U. S. 110, 46 S. Ct. 48, 70. L. Ed. 183. Nevertheless, a partnership means 'an ordinary partnership,' as was declared on page 113 of 269 U. S. . . ."

In that case *Copland* v. *Commissioner of Internal Revenue*, 41 F. 2d 501 (C.C.A. 7), is cited. This case involved a similar joint venture though of a few members, and it was expressly decided therein that it was not a "partnership". Lastly, it held that the amendment of 1932 to the Income Tax Act was not retroactive and could not be applied to the case.

This amendment is important because for the first time the word "partnership" was defined in the Act in the following manner:

"Section 1111(a)(3).—The term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this Act, a trust or estate or a corporation; and the term 'partner' includes a member in such a syndicate, group, pool, joint venture, or organization." Revenue Act of 1932, 26 U.S.C.A. 656.

And again it is important because in the *Wild* and *Copland* cases, *supra,* and others cited therein, it was also held that a joint venture was not a partnership under the laws in force before the amendment of 1932. Likewise in the instant case the intervener was not, before the year 1940, a *sociedad* as said term is defined in § 2(a)(3) of Act No. 74 of 1925, *supra,* since it had, for taxation purposes, the correct meaning of *sociedad. Wild* v. *Commissioner of Internal Revenue, supra,* and *Burk–Waggoner Oil Ass'n* v. *Hopkins, supra.* The Tax Court did not err in holding that it was not a *sociedad* during the years 1938 and 1939.

█ Is it a joint venture since 1940?

The Federal Act, as we have seen, was amended in 1932 in order to define clearly what constitutes a "partnership," including in the definition the joint venture, not for taxing the entity itself, as the "partnership" is not taxable—Internal Revenue Code, § 181—but in order to levy a tax on the partners, whether or not the profits have been distributed. 6 Mertens, Law of Federal Income Taxation 103, § 35.01 *et seq.* In Puerto Rico on the contrary, the *sociedad* as an entity, as well as its partners must pay income tax. When in 1941, § 2(a)(3) of the Act was amended to include the joint venture within the term *sociedad,* it was not done in order to levy a new tax on the individuals as such, but for the purpose of taxing the joint venture (considering it

as a *sociedad)* as well as the individuals composing said entity.

We have already decided that ". . . the mere community of property does not constitute a joint adventure. . . ." *Puig* v. *Tax Court,* 65 P.R.R. 691. See also *Buscaglia, Treas.* v. *Tax Court, Heirs of Fernández González, intervener,* decided by *per curiam* decision of April 12, 1946 and *Vías* v. *Tax Court,* 67 P.R.R. 459.

The facts of the instant case vary greatly from those which gave rise to our ruling in the three cases cited above. Although, as we have already decided, the participants of the community were not a *sociedad* under § 2(a)(3) before it was amended by Act No. 31 of 1941, they are, in our judgment, a joint venture for profit, under the above-mentioned Section. That they considered themselves such, is shown by the fact that they filed in the name of Community of the Heirs of Mateo Fajardo Carmona income tax returns for the year 1941 after the Act was amended. That fact although not conclusive, may be an evidential factor to create an estoppel.[3] In addition to the facts that the lower court considered proved there are others which were not mentioned in its decision and which show that the participants in the community contributed their respective condominia to the joint venture of using them for the planting and cultivation of sugar cane. The petitioner in his brief faithfully summarizes the facts as they appear from exhibits 7 and 8 of the intervener, thus:

". . . After said properties were purchased the purchasers signed a contract for the administration and operation thereof (Exhibit No. 7 of the Plaintiffs). By virtue of said contract the plaintiffs voluntarily and by mutual agreement limited the right of every co-owner to assign, encumber, or alienate his respective condominium (Exhibit No. 7, clause II); they changed the terms fixed by law for the administration of the condominia, since for certain matters they require the consent of 4/5 interest

---

[3] Mertens, op. cit., § 35.04, p. 116 and cases cited in footnote 81.

of the co-owners (Exhibit No. 7, clause III) ; Civil Code, § 332, 1930 ed.; they granted to each other the power to make loans in the name of all of them with the consent of only 4/5 interest of the co-owners (Exhibit No. 7, clause VII) ; they authorized the disbursements of weekly expenses with the signature of only two of the co-owners (Exhibit No. 7, clause VIII) ; they agreed on the determination of reserves of profits with the consent of only four-fifths of the co-owners (Exhibit No. 7, clause IX) ; they granted to each other the power to compel the attendance to meetings with only the votes of 50 per cent of the interest of the co-owners (Exhibit No. 7, Clause X) ; they agreed to transact businesses, banking representations, etc. in the name of all of them and under a common name (Exhibit No. 7, Clause XI) ; they agreed to pay per diem and traveling expenses to the co-owners for services rendered (Exhibit No. 7, Clause XIII; they authorized the renewal of leases or new leases with the vote of 4/5 interest of the co-owners (Exhibit No. 7, Clause XV) ; and, agreed on penalties for the noncompliance with the agreement (Exhibit No. 7, Clause XVI). In all the transactions made with the Central Eureka the accounts, documents, and operations were made in common in the name of the community and not in the name of each one of the members thereof. (See, among others, Exhibit No. 8 of the plaintiff.)"

These facts show that the participants in the community in this case have not confined themselves, as in the cases above cited, to lease their condominia and to receive their rent, but rather to carry on the business of operating the property owned in common for profit, for a certain number of years. The fiduciary relationship existing among the co-owners is similar to that existing among partners, each of them being up to a certain extent an agent for the others, since the agreement of four-fifths or of 50 per cent of them binds all of them and each one has a voice and vote in the administration. *Puig* v. *Tax Court, supra*. Although under the Civil Code the intervener is a community, for taxation purposes, it is not to said Code that we must look in order to determine whether it is a special entity known by the name of joint venture under § 2 (a) (3) of the Act of 1941, *supra*. We say that it is a special entity not only because

it is so defined by the statute but because it was so defined by authorities which said that a joint venture is "a special or limited partnership or partnership for a special purpose." *Bond* v. *O'Donnell*, 218 N.W. 898 (Iowa, 1928); *McDaniel* v. *State Fair of Texas*, 286 S.W. 513 (Tex., 1926) and see 35 Michigan Law Review 297 and 41 Michigan Law Review 336.

In *Chisholm* v. *Gilmer*, 81 F. 2d 120, 124, (C.C.A. 4, 1936), cited in *Puig* v. *Tax Court*, *supra*, the court speaking through Mr. Justice Park, said:

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"It is clear, we think, that, with respect to the purchase, holding, and sale of the stock in question, the defendants were engaged in a joint enterprise. Of course, they were not partners generally, but they unquestionably assumed the relationship of partners with respect to this particular undertaking; and that is the essence of a joint adventure. (Authorities.) Although combination for the purpose of making profits is ordinarily characteristic of a joint adventure, the purpose of making direct profits is no more essential to that relationship than to that of partnership. A joint adventure, we think, exists when two or more persons combine in a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control and management. . . . The relationship was defined by Judge Hough of the Second Circuit, in the case last cited [4] as 'a commercial enterprise by several persons jointly.'

"As was held in *Bowmaster* v. *Carroll* (C.C.A. 10th) 23 F. 2d 825, upon which defendants rely, the purchase of property by two or more persons, each of whom contributes a portion of the purchase price, makes them joint owners of the property, but does not, *without more*, establish between them the relation of joint adventurers. . . . But there is much more shown here than the mere purchase of the stock. . . ." (Italics ours.)

And see also *Motter* v. *Smyth*, 77 F. 2d 77 (C.A.A. 10th, 1935); Mertens, op. cit., p. 118, § 35.05; *C. A. Babcock Co.*

---

[4] *Joring* v. *Harriss*, 292 F. 974.

v. *Katz*, 253 P. 373 (Ore., 1927) wherein it was held that operating a farm under agreement by which expenses and profits were divided constitutes a joint enterprise, and annotations in 48 A.L.R. 1055, 1062 and 63 A.L.R. 909.

Similarly as in the *Chisholm* case, *supra*, in the case at bar there has been evidence of a great deal more than the mere purchase of certain condominia. It was shown that a voluntary and intentional community was created to operate the business of planting sugar cane in such a way that, for taxation purposes, it changed the community into a joint venture and consequently, into a *sociedad* under § 2 (*a*) (3), *supra*, as amended.

■ As to the allegation made by the intervener in the lower court that to make Act No. 31 of 1941 retroactive to January 1, 1940, as provided therein, would render it unconstitutional, is a matter already decided adversely in *Ballester* v. *Court of Tax Appeals*, 61 P.R.R. 460, 483–88, affirmed in *Ballester–Ripoll* v. *Court of Tax Appeals of P. R.*, 142 F. 2d 11 (C.C.A. 1, 1944), certiorari denied in 323 U. S. 723.

■ The second error was, therefore, partly committed. As to the first, that is, that the Tax Court permitted the intervener to file an amended complaint after the lapse of 30 days after service of the decision of the administrative hearing, said court relied on Rule 15 (*a*) and (*c*) of the Rules of Civil Procedure to allow such amendment. In our judgment, it did not err in so doing.

The decision of the Tax Court should be affirmed in so far as it held that the intervener was not a *sociedad* during the years 1938 and 1939, and reversed in so far as it held that it was not such a *sociedad* during the year 1940 and thereafter, and the case should be remanded for further proceedings.

Mr. Justice Negrón Fernández did not participate herein.