Rafael Buscaglia, Tesorero de Puerto Rico, peticionario, *v.* Tribunal de Contribuciones, demandado; Comunidad Sucesión de Mateo Fajardo Cardona, interventora.

Núm. 203.—*Sometido:* Marzo 1, 1949. *Resuelto:* Junio 21, 1949.

*Hon. Procurador General Vicente Géigel Polanco y Edgar S. Belaval, Abogado Especial del Departamento de Justicia,* abogados del peticionario; *Oscar Souffront, Amador Ramírez Silva y Andrés Guillemard,* abogados de la interventora, querellante en el pleito principal.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

El día 30 de agosto de 1944 el Tesorero de Puerto Rico notificó a la Comunidad Sucesión de Mateo Fajardo Cardona deficiencias en su contribución sobre ingresos para los años 1938, 1939, 1940 y 1941 ascendentes a $57,245.31, basándose en la sección 2(a)(3) de la Ley núm. 74 de 1925 (pág. 401)(1) y en la misma sección, según fué enmendada por la Ley núm. 31 de 12 de abril de 1941 ((1) pág. 479).(2)

---

(1)La sección 2(a)(3) de la Ley de Contribuciones Sobre Ingresos, según rigió hasta el 31 de diciembre de 1939 disponía que:

"(3) El término 'sociedad' incluirá las sociedades civiles, mercantiles, industriales, agrícolas, profesionales o de cualquiera otra índole y las asociaciones de todas clases."

(2)Según enmendado por la Ley núm. 31 de 12 de abril de 1941, con efecto retroactivo a primero de enero de 1940, el artículo 2(a)(3) lee así:

"El término 'sociedad' incluirá las sociedades civiles, mercantiles, industriales, agrícolas, profesionales o de cualquiera otra índole, conste o no, su constitución en escritura pública o documento privado e incluirá, además, cuando dos o más personas bajo un nombre común o no se dediquen a una empresa común (*joint venture*), con fines de lucro."

No conforme la contribuyente con la notificación héchale por el Tesorero y después de cumplir con los requisitos legales previos, se querelló ante el Tribunal de Contribuciones, el cual, después de celebrar una vista, llegó a la conclusión de que la Comunidad de la Sucesión de Mateo Fajardo Cardona, siendo una comunidad establecida de acuerdo con las disposiciones del Código Civil de Puerto Rico que la regula y no una sociedad o un *"joint venture"*, no estaba obligada a rendir declaraciones sobre ingresos y, en su consecuencia, anuló las deficiencias que el Tesorero impusiera a la mencionada comunidad.

No conforme el Tesorero estableció el presente recurso de *certiorari* imputándole al tribunal inferior la comisión de dos errores al permitir a la contribuyente radicar una querella enmendada impugnando ciertas actuaciones del Tesorero que no habían sido impugnadas en la querella original y al resolver que la contribuyente no era una sociedad o empresa común (*joint venture*) con fines de lucro.

Discutiremos el segundo error señalado, ya que el peticionario admite que si sostenemos la decisión del Tribunal de Contribuciones, se hace innecesaria la discusión del primero.

■ De acuerdo con una estipulación de las partes, el Tribunal de Contribuciones hizo constar que no hay discrepancia alguna entre ellas en cuanto a los siguientes hechos:

"Mateo Fajardo Cardona, al fallecer en febrero 6 de 1934, dejó como únicos herederos a: Antonia Cabassa Texidor viuda de Fajardo; José Angel, Mateo, María Luisa, Carlos H., Emilia, Lydia y Rosalinda Fajardo Dávila; y Teodoro Fajardo Cabassa.

"Por escritura Núm. 51, otorgada el 13 de noviembre de 1935, ante el notario Miguel A. García Méndez, dichos herederos realizaron una partición transaccional de los bienes del finado Mateo Fajardo Cardona.

"En junio 13 de 1938, de acuerdo con las disposiciones de la escritura núm. 102, ante el notario Oscar Souffront, otorgada por la Central Eureka, Inc. a favor de la Comunidad de la Sucesión de Mateo Fajardo Cardona, las fincas descritas en dicha escritura Núm.

102 fueron vendidas en común proindiviso a los antes mencionados herederos y sus consortes, quedando creada una comunidad por el término de diez años.

‘‘* * . * * * * *

‘‘Los miembros de la comunidad de marras prepararon en septiembre 15 de 1938 un documento que denominaron 'Reglas para la Administración de la Comunidad de la Sucesión de don Mateo Fajardo y Cardona', y que contiene las bases, convenios y estipulaciones con sujeción a los cuales los condueños interesados se comprometieron a regir y administrar la comunidad de bienes a la cual, en la indicada fecha, pertenecían. Con la misma fecha redactaron otro documento complementario de dichas reglas para la administración de la comunidad.

‘‘Ambos fueron protocolizados mediante acta al efecto, ante el notario Carlos García Méndez, en San Germán, en septiembre 28 de 1938.

‘‘Según el contenido de dichas reglas para la administración, los querellantes convinieron, entre otras cosas:

‘‘(1) Permanecer en la comunidad por el término de 10 años, sin perjuicio de prorrogarlo por el tiempo que fuere necesario, y de acuerdo con la ley. Véanse los artículos 326, segundo párrafo, y 334 del Código Civil.

‘‘(2) Ninguno de los comuneros, sin el consentimiento de los demás, vendería, cedería, gravaría, o enajenaría en forma alguna a terceras personas o entidades sus participaciones en las tierras que poseían en común, ni en los derechos y acciones que a todos pertenecieran; pero si cualquiera de los comuneros se viere en la imperiosa necesidad de tener que gravar su participación, para obtener fondos, lo informaría a los demás condueños, dando a éstos la opción para concertar el préstamo que fuere necesario. En el caso de que ninguno de los condueños otorgare el crédito, y entonces la parte correspondiente del condominio fuere gravada a favor de tercera persona, el gravamen se efectuaría con la condición de que, si hubiere posteriormente una ejecución, el acreedor o su cesionario estaría obligado a respetar la comunidad y todas sus cláusulas y convenios durante el término fijado, o su prórroga. Véanse los artículos 332, 333 y 334 del Código Civil.

‘‘(3) La comunidad tenía facultad de obtener fondos para fines de refacción, por el término y condiciones que fueren necesarios, mediante acuerdo de cuatro quintas partes en interés de los condueños. Véanse los artículos 326 (segundo párrafo) y 332 del Código Civil.

"(4) Los desembolsos semanales que fueren necesarios para los cultivos y cosechas en los bienes inmuebles del condominio se harían mediante recados (*vouchers*) y cheques para cubrir la monta de. éstos, los cuales firmaría el administrador y la persona que los comuneros designaren, o uno de los comuneros juntamente con el administrador o la persona designada al efecto; y, en caso de impedimento, dos de los comuneros. Véanse los artículos 326 y 332 del Código Civil.

"" * * * * * * . *

"Todos los bienes adquiridos por la Comunidad de la Sucesión de Mateo Fajardo Cardona hasta el primero de abril de 1938 fueron comprados a la Central Eureka, Inc.; y son los que se relacionan y describen en la repetida escritura Núm. 102, supra.

"Durante el tiempo a que se refiere la querella, la Comunidad de la Sucesión de Mateo Fajardo Cardona era uno de los colonos de la Central Eureka, Inc.

"" * * * * * * *

"En relación con las cuentas de refacción los litigantes estipularon que Central Eureka, Inc. observaba la práctica de abonar en ellas, a favor de la Comunidad de la Sucesión de Mateo Fajardo· Cardona, los montos de las liquidaciones de cañas recibidas para su molienda durante cada zafra; y la comunidad, a su vez, cargaba en sus libros los mismos montos en contra de la Central Eureka, Inc.

"El producto total de las cañas, por el tiempo en cuestión, es mayor que la monta de los cargos en concepto de intereses que figuraban en los libros de la Central Eureka, Inc.

"Nunca se expidió cheque alguno por la central, ni por la comunidad, para el saldo de las cuentas entre ellas; y fué en sus cuentas corrientes, con los correspondientes abonos y cargos, que se obtuvieron los resultados finales, a ser usados cuando procediera una liquidación.

"Todos los querellantes que han comparecido en el caso del epígrafe, y que fueron miembros de la Comunidad de la Sucesión de Mateo Fajardo Cardona, eran partícipes en los beneficios obtenidos por ésta en los años en que eran condóminos; y en sus planillas individuales incluyeron las correspondientes cantidades procedentes de las reparticiones de beneficios obtenidos por la. comunidad.

"Al efectuarse en junio 13 de 1938 la compraventa de los terrenos de la comunidad, los condueños firmaron nueve pagarés hipotecarios por la suma de $30,428.41 cada uno, la satisfacción de los cuales, por la monta de $273,855.69, quedó garantizada por una hipoteca voluntaria, descrita en la escritura Núm. 102, supra, sobre 39

fincas rústicas. La hipoteca cubría también un crédito de $15,000 para intereses en caso de mora, y otro de $10,000 para costas y honorarios de abogado en caso de reclamación judicial o litigio, no teniendo ninguna de las obligaciones firmadas carácter de solidaria, y limitándose la responsabilidad de cada condueño a la misma proporción que le correspondiere en la totalidad de las fincas adquiridas en común y proindiviso.

" * * * * * * *

"Llegado el momento en que convino a la Central Eureka, Inc. la separación de sus actividades industriales y las otras que tenía relacionadas con la siembra y cultivo de cañas, se procedió, siguiendo el consejo de abogados, por la manera más rápida posible, a la creación de una comunidad de bienes que adquiriera todas las fincas de dicha central.

"Al efectuarse el traspaso los compradores eran todos accionistas de la Central Eureka, Inc.; y la parte que cada uno adquirió en la totalidad de las fincas eran aproximadamente igual a su participación en el capital de la central. Véase el Cuadro I, supra.

"Desde la fecha del traspaso de las fincas, éstas han sido explotadas y administradas siempre en la misma forma, es decir sin cambio alguno, a pesar del elevado número de veces, en que, según testificara el condueño Jaime Annexy, se han hecho gestiones y esfuerzos por llevar a cabo una división. Los obstáculos hallados se deben, entre otras cosas, a que las tierras son de propiedades físicas muy variadas, siendo algunas de las fincas útiles para pastos; algunas apropiadas para cocales; y otras aprovechables para cañas de azúcar. Ciertas parcelas tienen suelos de aluvión, y otras hay que son de terrenos altos. Las hay cenagosas; áridas; y montañosas. Sus valores, por consiguiente, varían mucho.

"Las muertes de algunos de los condueños complicaron la situación e hizo más difícil aún la división. A los fines de facilitar esta última, las propiedades se mensuraron de nuevo y se prepararon nuevos planos, en los cuales se demostraron los detalles de las distintas fincas. Con el uso de los planos se hizo más fácil llegar a algunos acuerdos sobre la división futura; y se pudo convenir en que se realizaran algunas agrupaciones parciales, para rebajar así de 20 a 6 ó 7 el divisor del área total de las fincas.

"Sin embargo, poco después surgió la amenaza de una expropiación de los terrenos, por parte de la Autoridad de Tierras; y la

posibilidad de que algunas parcelas, de un valor de unos $500 por cuerda, fueran expropiadas al precio de unos $100 por unidad de área.

"De acuerdo con lo convenido por los condueños, y según las reglas para la administración de la comunidad, ésta tenía que nombrar un administrador 'para atender al cultivo, fomento y conservación de las tierras' en cuestión, con todos los deberes y facultades que generalmente tienen los administradores de campo, de acuerdo con los usos y costumbres en Puerto Rico.

"Los desembolsos semanales y los gastos ordinarios relacionados con los cultivos en las fincas, los autorizaba y realizaba, en la práctica, el administrador de campos mencionado; pero éste no podía, como tampoco ninguno de los condueños, llevar a cabo operaciones de banca, ni comprar ni vender, gravar o en forma alguna enajenar bienes sin el previo consentimiento de todos los comuneros. Ninguno de éstos podía actuar, ni actuó, a nombre de los otros.

"Después que empezó a regir la Ley núm. 31 del año 1941 (pág. 479), por la cual se enmendó, con efecto retrospectivo, el artículo 2(a)(3) de la Ley de Contribuciones sobre Ingresos, surgió la duda sobre si una comunidad por el estilo de la constituída en el caso del epígrafe tendría que pagar contribuciones de ingresos de igual manera que una sociedad.

"En virtud de tal duda, la Comunidad de la Sucesión de Mateo Fajardo Cardona rindió una planilla por el año terminado en junio 30 de 1941. Lo hizo así porque el contador público autorizado que acostumbraba preparar sus declaraciones de ingresos le recomendó que presentara en el Departamento de Hacienda una declaración de ingresos y que satisficiera la contribución correspondiente, sin perjuicio de que, posteriormente, reclamara la devolución de lo que hubiere pagado indebidamente. Véase el *Exhibit* H del querellado, en el cual aparece tachada la palabra sociedad, y escrita, en maquinilla, la palabra comunidad.

"Anteriormente los querellantes habían registrado en el Departamento de Hacienda sus declaraciones de ingresos individuales, haciendo figurar en ellas sus respectivos ingresos derivados de sus participaciones en los percibidos por la Comunidad de la Sucesión de Mateo Fajardo Cardona.

"\* \* \* \* \* \* \*

"El 7 de enero de 1944 fué registrada en la secretaría del tribunal de distrito de Mayagüez, por Antonia Cabassa viuda de Fajardo, y Teodoro Fajardo Cabassa, una acción civil sobre división de

la Comunidad· de la Sucesión de Mateo Fajardo Cardona, en relación con las mismas fincas adquiridas en común proindiviso según los términos de la escritura Núm. 102, supra.

"Las fincas adquiridas por los apelantes se dedicaban antes de su traspaso, y después de éste, durante los años a que se refiere la querella, al cultivo de cañas de azúcar."

De acuerdo con estos hechos probados, el Tribunal de Contribuciones resolvió que la Comunidad de la Sucesión de Mateo Fajardo Cardona no era, para los años 1938 y 1939, una sociedad y tampoco, para los años 1940 en adelante, una empresa común (*joint venture*) con fines de lucro.

Los hechos que el Tribunal de Contribuciones consideró probados están ampliamente sostenidos por la estipulación de las partes y por la prueba adicional presentada. Debemos aceptarlos—*Buscaglia, Tes.* v. *Tribunal de Contribuciones y Santiago, et al., interventores,* 69 D.P.R. 849—y limitarnos a resolver si esos hechos sostienen las conclusiones legales a que llegó el tribunal.

En el caso de *Carle Dubois* v. *Benítez,* 46 D.P.R. 188, 192, ya hemos expuesto algunas de las características que distinguen la comunidad de la sociedad, citando comentarios de Manresa al efecto.

Hemos resuelto, además, que ". . . la palabra *partnership* no se usa en nuestra Ley de Contribuciones sobre Ingresos en el mismo sentido en que se usa en el derecho común. Es una traducción de la palabra 'sociedad' usada en derecho civil. Y una sociedad es una persona jurídica distinta de sus socios." *Ballester* v. *Tribunal de Apelación,* 61 D.P.R. 474, 494-95. Y véanse *Buscaglia, Tes.* v. *Tribunal de Contribuciones,* 65 D.P.R. 9 y 361 y *Wild* v. *Commissioner of Internal Revenue,* 62 F.2d 777, (C.C.A. 2d, 1933), *certiorari* denegado en caso similar en 289 U. S. 754, en el que se resolvió que el término *"partnership"*, bajo la Ley de Rentas Internas federal de 1921 (42 Stat. 227), significa un *partnership* corriente (*ordinary partnership*) y que un sindicato creado por contrato para usar las aportaciones de sus miembros para

comprar, retener y vender valores (*securities*) y tierras no constituía un "*partnership*" bajo dicha ley, la cual en su sección 2 define la palabra "persona" como incluyendo a los "*partnerships*" y las corporaciones tanto como a los individuos, y en la sección 218(*a*) disponía "Que individuos que realizan negocios en '*partnership*' deberán pagar contribución sobre ingresos solamente en su capacidad individual." Se dijo en dicho último caso, a la pág. 778:

"... Todo lo que tenemos que resolver es si es un '*partnership*', *stricti juris*, o tal empresa común (*joint venture*) que no interpuso ningún fiduciario para librar a los dueños de la contribución directa. Es cierto que la ley local no controla en tales casos. Aun cuando el sindicato no sea un '*partnership*' bajo la ley de Nueva York, puede serlo bajo la ley de rentas internas; pero lo contrario se resolvió en *Burk–Waggoner Oil Ass'n* v. *Hopkins*, 269 U. S. 110, 46 S.Ct. 48, 70 L.Ed. 183. Empero, un '*partnership*' significa *un partnership corriente*, según se resolvió a la pág. 113 de 269 U. S. ..."

Se cita en este caso el de *Copland* v. *Commissioner of Internal Revenue*, 41 F.2d 501 (C.C.A. 7), en el cual estaba envuelta una empresa común similar, aunque de menos miembros, y en el que se resolvió expresamente que no constituía un "*partnership*". Por último, se resolvió que la enmienda de 1932 a la Ley de Rentas Internas no tenía carácter retroactivo y no podía aplicarse al caso.

Esta enmienda es importante porque por primera vez se definió en la ley la palabra "*partnership*" en esta forma:

"Sección 1111(*a*)(3)—El término '*partnership*' incluye un sindicato, grupo, *pool*, empresa común (*joint venture*), u otra organización no incorporada, a través o por medio de la cual cualquier negocio, operación financiera o empresa (*venture*) se lleve a cabo y que no sea, dentro del significado de esta Ley, un *trust* o *estate* o corporación; y el término 'socio' incluye un miembro de tal sindicato, grupo, pool, empresa común u organización." 26 U.S.C.A. 656.

Y es importante, además, porque en los casos de *Wild* y *Copland*, supra, y otros en ellos citados, se resolvió también que una empresa común no constituía un "*partnership*" bajo

las leyes anteriores a la enmienda de 1932. En igual forma, en el presente caso, la interventora, antes del año 1940 no constituía una sociedad según dicho término está definido en la sección 2(a)(3) de la Ley núm. 74 de 1925, supra, ya que el mismo, para fines contributivos, tenía el significado corriente de sociedad. *Wild* v. *Commissioner of Internal Revenue*, supra y *Burk-Waggoner Oil Ass'n* v. *Hopkins*, supra. No erró el Tribunal de Contribuciones al resolver que no lo era durante los años 1938 y 1939.

 ¿Es una empresa común (*joint venture*) desde el año 1940?

La Ley Federal, como hemos visto, fué enmendada en el año 1932, para definir claramente lo que constituye un "*partnership*", incluyéndose en la definición a la empresa común, no para imponer tributación a dicha entidad como tal, pues el "partnership" no tributa—*Internal Revenue Code*, sec. 181—sino para imponer la contribución a los socios, háyanse distribuído o no los beneficios. 6 Mertens, *Law of Federal Income Taxation* 103, sección 35.01 *et seq.* En Puerto Rico, por el contrario, tanto la sociedad como entidad y sus socios, tienen que pagar la contribución sobre ingresos. Al enmendarse en 1941 la sección 2(a)(3) de la ley para incluir en la definición de "sociedad" las empresas comunes, se hizo, no para imponer una nueva contribución a los individuos como tales, sino con el fin de tributar tanto a la empresa común (considerándola como una sociedad) como a las personas que constituyen dicha entidad.

Ya hemos resuelto que ". . . la mera comunidad de bienes no constituye una empresa común para fines de lucro. . . ." *Puig* v. *Tribunal de Contribuciones*, 65 D.P.R. 734. Véanse además *Buscaglia, Tes.* v. *Tribunal de Contribuciones, Sucn. Fernández González*, interventora, resuelto con opinión *per curiam* el 12 de abril de 1946 y *Vías* v. *Tribl. de Contribuciones*, 67 D.P.R. 491.

Los hechos del presente caso difieren grandemente de aquellos que dieron lugar a nuestras decisiones en los tres casos que acabamos de citar. Si bien, como hemos resuelto antes, los partícipes de la comunidad no constituían una sociedad bajo el artículo 2(a)(3) antes de ser enmendado por la Ley núm. 31 de 1941, sí constituyen, a nuestro juicio, una empresa común con fines de lucro bajo dicho artículo enmendado. Que ellos mismos así se consideraron lo demuestra el hecho de que, a nombre de la Comunidad de la Sucesión de Mateo Fajardo Cardona, rindieron declaración sobre ingresos para el año 1941 al ser enmendada la ley. Este hecho, aun cuando no definitivo, puede constituir un factor evidenciario para establecer un impedimento.(3) Además de los hechos que el tribunal inferior consideró probados existen otros, los cuales no mencionó en su resolución y que demuestran que los partícipes en la comunidad aportaron sus condominios a la empresa común de explotarlos en la siembra y cultivo de cañas de azúcar. El peticionario, en su alegato, hace un resumen exacto de los hechos según aparecen de los *exhibits* 7 y 8 de la interventora, en esta forma:

". . . Luego de comprados dichos bienes los adquirentes firmaron un contrato para la administración y explotación de los mismos (Exhibit núm. 7 de los Querellantes). A virtud de dicho contrato los querellantes, voluntariamente y de común acuerdo, limitaron el derecho que tiene todo condómino a ceder, gravar o enajenar sus respectivos condominios (Exhibit núm. 7, Cláusula II); variaron los términos que fija la ley para la administración de condominios ya que para ciertas cuestiones requiere el consentimiento de cuatro quintas partes (4/5) en interés de los condueños (Exhibit núm. 7, Cláusula III); Código Civil, artículo 332, edición 1930; se concedieron mutuamente el poder de tomar dinero a préstamo a nombre de todos con el consentimiento de sólo cuatro quintas partes (4/5) en interés de los condueños (Exhibit núm. 7, Cláusula VII); autorizaron el desembolso de gastos semanales con la sola firma de dos de los comuneros (Exhibit núm. 7, Cláusula VIII); convinieron en la determinación de reservas de beneficios con el solo consentimiento de cuatro

(3) Mertens, ob. cit., sec. 35.04, pág. 116 y casos citados en el escolio 81.

quintas partes (⅘) en interés de los condueños (Exhibit núm. 7; Cláusula IX) ; se concedieron mutuamente el poder de obligarse a concurrir a reuniones con sólo el voto del 50 por ciento en interés de los condueños (Exhibit núm. 7, Cláusula X) ; convinieron en realizar los negocios, representaciones bancarias, etc. a nombre de todos y usando un nombre común (Exhibit núm. 7, Cláusula XI) ; acordaron el pago de dietas y millaje para comuneros por servicios prestados (Exhibit núm. 7, Cláusula XIII) ; autorizaron renovación de arrendamientos o nuevos arrendamientos con el voto de cuatro quintas partes (⅘) en interés de los condueños (Exhibit núm. 7, Cláusula XV) ; y, convinieron penalidades por el incumplimiento del convenio (Exhibit núm. 7, Cláusula XVI). En todas las operaciones hechas con la Central Eureka, Inc., las cuentas, documentos y operaciones se hicieron en común a nombre de la Comunidad y no a nombre de cada uno de los componentes de la misma. (Véase, entre otros, el Exhibit núm. 8 de la querellante)."

Estos hechos demuestran que los partícipes en la comunidad de bienes en este caso no se han limitado, como en los casos antes citados, a arrendar sus condominios y a percibir sus rentas, sino más bien que están llevando a cabo el negocio de explotar las fincas poseídas en común, con fines de lucro, por un determinado número de años. Existe entre los comuneros una relación fiduciaria parecida a la que existe entre los socios, siendo cada uno de ellos hasta cierto límite mandatario de los demás pues el acuerdo de cuatro quintos o el cincuenta por ciento de ellos puede obligar a todos y cada uno de ellos tiene voz y voto en la administración. *Puig* v. *Tribunal de Contribuciones,* supra. Si bien bajo el Código Civil la interventora es una comunidad, para los fines contributivos no es a dicho Código que tenemos que acudir para determinar si es una entidad especial de las conocidas con el nombre de empresa común para fines de lucro (*joint venture*) bajo la sección 2(*a*)(3) de la Ley de 1941, supra. Decimos que es una entidad especial, no sólo porque así lo define la ley sino porque así ha sido definida en la jurisprudencia diciéndose que una empresa común es "un *partnership* especial o

limitado con un fin especial.'' *Bond* v. *O'Donnell,* 218 N.W. 898 (Iowa, 1928); *McDaniel* v. *State Fair of Texas,* 286 S.W. 513 (Tex., 1926) y véanse 35 Michigan Law Review 297 y 41 Michigan Law Review 336.

En el caso de *Chisholm* v. *Gilmer,* 81 F.2d 120, 124, (C.C.A. 4, 1936), citado en el de *Puig* v. *Tribunal de Contribuciones,* supra, la corte, por voz del Juez Parker, dijo:

\* \* \* \* \* \* \*

"Creemos que está claro que, en relación con la compra, retención y venta de las acciones en cuestión, los demandados estaban dedicados a una empresa común. Desde luego, ellos no eran socios en términos generales, pero incuestionablemente asumieron la relación de socios con respecto a esta particular empresa, y esa es la esencia de una empresa común. (Citas.) Aun cuando la combinación para obtener beneficios es la característica ordinaria de una empresa común, el propósito de realizar beneficios directos no es más esencial a esa relación que a la de una sociedad. Una empresa común, creemos, existe cuando dos o más personas se combinan en un negocio común para su beneficio mutuo, con el entendido, expreso o implícito que habrán de compartir las ganancias o pérdidas de la empresa y que cada uno ha de tener voz en su control y administración. . . . La relación fué definida por el Juez Hough del Segundo Circuito en el último caso citado(⁴) como 'una empresa comercial por varias personas en comunidad.'

"Como se dijo en *Bowmaster* v. *Carroll* (C.C.A. 10th) 23 F.2d 825, en el cual confían los demandados, la compra de propiedad por dos o más personas, cada una de ellas contribuyendo una parte del precio de compra, los hace comuneros en la propiedad, pero, *sin algo más,* no establece entre ellos la relación de empresarios comunes (*joint adventurers*). Pero aquí se ha demostrado mucho más que la mera compra de acciones. . . .'' (Bastardillas nuestras.)

Y véanse, además, *Motter* v. *Smyth,* 77 F.2d 77 (C.C.A. 10th, 1935); Mertens, ob. cit., pág. 118, sec. 35.05; *C. A. Babcock Co.* v. *Katz,* 253 P. 373 (Ore., 1927) en el que se resolvió que el operar una finca bajo un acuerdo de dividir los gastos

---

(⁴)*Joring* v. *Harriss,* 292 F. 974.

y los beneficios constituye una empresa común (*joint enterprise*), y anotaciones en 48 A.L.R. 1055, 1062 y 63 A.L.R. 909.

En igual forma que en el de *Chisholm,* supra, en el caso de autos se ha demostrado mucho más que la mera compra de unos condominios. Se ha demostrado una voluntaria e intencional comunidad en la operación del negocio de siembra de cañas de azúcar en forma tal que, a los efectos contributivos, convirtió a la comunidad en una empresa común y en su consecuencia, en una sociedad bajo la sección 2(*a*)(3), supra, según enmendada.

■ En cuanto a la alegación hecha por la interventora en el tribunal inferior de que de darse efecto retroactivo a la Ley núm. 31 de 1941 al primero de enero de 1940, como la misma provee, la haría inconstitucional, ya esta cuestión fué resuelta en su contra en *Ballester* v. *Tribunal de Apelación,* 61 D.P.R. 474, 501–06, confirmado en *Ballester-Ripoll* v. *Court of Tax Appeals of P. R.,* 142 F.2d 11 (C.C.A. 1, 1944), *certiorari* denegado en 323 U. S. 723.

■ Se cometió, pues, en parte el segundo error y en cuanto al primero, es decir, el haber permitido el Tribunal de Contribuciones que la interventora radicara una querella enmendada después de haber transcurrido los treinta días de la notificación del resultado de la vista administrativa, dicho tribunal se basó en las Reglas 15(*a*) y (*c*) de las de Enjuiciamiento Civil para permitir la enmienda. No erró a nuestro juicio al así hacerlo.

*Debe confirmarse la resolución del Tribunal de Contribuciones en tanto en cuanto resolvió que la interventora no era una sociedad durante los años 1938 y 1939 y revocarse en cuanto resolvió que no lo era desde el año 1940 en adelante, y devolverse el caso para ulteriores procedimientos.*

El Juez Asociado Sr. Negrón Fernández se inhibió.